# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-3563

JOSE TREJO,

*Petitioner-Appellant,*

v.

DONALD HULICK,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 C 4387—**Paul E. Plunkett**, *Judge.*

ARGUED AUGUST 3, 2004—DECIDED AUGUST 19, 2004

Before POSNER, ROVNER, and DIANE P. WOOD, *Circuit
Judges.*

POSNER, *Circuit Judge.* Jose Trejo was convicted in an
Illinois state court of murder, and after exhausting his state
remedies sought federal habeas corpus, lost in the district
court, and appeals. He argues that no reasonable trier of fact
could have found that there was enough evidence to support
a finding of guilt beyond a reasonable doubt, *Jackson v.
Virginia*, 443 U.S. 307 (1979), and that the state appellate
court was unreasonable to suppose there was and so he is
entitled to relief under 28 U.S.C. § 2254(d)(1) (unreasonable
application of a rule of federal law clearly established by the
U.S. Supreme Court).

"Vicious" Trejo and "Aggie" Villalobos were members of a gang called Satan's Disciples, as was Danny Valencia. The night after a gang meeting at which Valencia and Villalobos clashed, Valencia was murdered. Trejo, Villalobos, and a third gang member were prosecuted for the murder. At the conclusion of a bench trial, the judge convicted Trejo while acquitting the other two defendants.

The case against Trejo rested on the testimony of three witnesses. (In contrast, the cases against his codefendants rested on just one witness each.) One of them, Patricia Negrete, another Satan's Disciple, had given a state's attorney a signed statement that hearing gunshots emanating from an alley near where she lived she had run to the alley's entrance and seen Villalobos swinging his right arm at someone lying on the ground and heard the victim cry out, "You've already got me." At trial Negrete proved to be a hostile witness and denied having seen anything. But confronted with her signed statement, she testified that she had told the state's attorney who had written up the statement that she had seen Trejo and Villalobos kill Valencia, though there is no mention of Trejo in the statement itself.

The second witness, Juan Garibay, shown a photo array that included Trejo, told the police that Trejo looked like one of the men whom he had seen from the window of his house running in the alley on the night of the murder and several months earlier had seen park a car in front of the house. (He later identified Trejo in a line-up, as well.) On the night of the murder, however, Garibay was not wearing his glasses; although he is required to wear them when driving, he testified that he sees fine without them. He also testified, contrary to what he had told the police, that he didn't recall ever having seen Trejo. He added, however, that his family had been threatened if he testified, and this may explain his recantation.

The third witness, Ricardo Gonzalez, another Satan's Disciple, testified to having heard Trejo and the third defendant admit murdering Valencia. Gonzalez testified that he too was afraid of retribution for testifying.

Trejo contends that Negrete did not implicate him in either her statement or her testimony; that Garibay's identification of him as one of the men in the alley was wholly unworthy of belief; and that the trial judge must have disbelieved Gonzalez's testimony because the judge acquitted the third defendant, whom Gonzalez had implicated equally with Trejo. But given our deferential standard of review, which requires us to consider not whether the state courts were incorrect but whether they were unreasonable, we cannot allow Trejo to peel the onion in this fashion. Always to be borne in mind is that "a number of weak proofs can add up to a strong proof." *Mataya v. Kingston*, 371 F.3d 353, 358 (7th Cir. 2004); see also *Rowan v. Owens*, 752 F.2d 1186, 1188-89 (7th Cir. 1984); cf. *United States v. Jakobetz*, 955 F.2d 786, 793, 798-800 (2d Cir. 1992). Trejo misses the point in mounting separate attacks against each of the three witnesses without considering that the whole might be greater than the sum of the parts.

To start at the back end: since Gonzalez's testimony was the only evidence against the third man, the fact that the judge thought it insufficient to convict that man beyond a reasonable doubt does not establish that he disbelieved it; nor did he say he disbelieved it. His action signifies only that he thought the confession required corroboration. The question then becomes whether it was reasonable to conclude that Gonzalez's testimony was sufficiently corroborated by either Negrete or Garibay (or both) to justify convicting at least Trejo.

While not entirely without probative value, Garibay's evidence was weak, although this was not because of his recantation, which is easily explained by the threats to his family. One problem is his glasses. Glasses for driving correct prob-

lems with distance vision, so if Garibay had testified that he can read fine without his glasses, that would be believable. But to see a man in the alley from his house would presumably require the use of his distance vision, and if he could see the man without his glasses one wonders why he needs glasses for driving. Still, we do not know how far away the man was when Garibay saw him; he might have been at a point in the alley just outside Garibay's window.

There is a bigger hole in his testimony: it is highly implausible that he would have remembered Trejo from having seen him park his car months earlier, unless Trejo's appearance is extremely distinctive, which is not suggested. Even so, while Garibay's picking out Trejo in the photo spread *may* have been just a lucky guess, it is something. His picking him out of the line-up later was something too, though less. Having identified Trejo from his photograph, Garibay would have been primed to pick him out of a line-up as well; yet if mistaken the first time he might have caught his mistake when confronted with the person, since what he had seen in the alley on the fatal night was a person rather than a photograph.

Negrete's testimony provides stronger corroboration of Gonzalez's. True, if taken literally it seems just a mistaken recollection of what was in her signed statement, which did not mention Trejo. But there are alternative interpretations. One, which seems however quite implausible, is that Negrete told the state's attorney who took down her statement that Trejo was one of the murderers, but the state's attorney somehow neglected to record this crucial accusation. The second interpretation, which is quite plausible, is that Negrete remembered (erroneously) having told the prosecutor that Trejo had been one of the murderers because he *had* been one of the murderers—she had seen him in the alley. Indeed, why else would she have remembered having told the state's attorney

this? Remember that she was a recalcitrant witness. Asked point blank what she saw on the night of the murder, she said she saw nothing. But she was insistent, indeed emphatic, that she had told the state's attorney that she had seen Trejo.

Here is the relevant testimony:

Q:  What was in the statement prepared by the state's attorney?

A:  That I seen who did it.

Q:  That you seen him?

. . .

A:  I said I seen Aggie and Vicious doing it.

Q:  You said you saw Aggie and Vicious do what.

A:  Kill Giz?

Q:  Kill what?

A:  Kill Gizmo [Valencia].

Q:  It's your testimony that you told the state's attorney you saw Aggie and who kill Gizmo?

A:  Vicious.

Q:  And Vicious kill Gizmo?

A:  Yes.

Q:  What did you see Vicious do?

A:  Nothing.

Q:  So you didn't see Vicious do anything?

A:  Correct.

Q:  And your testimony today is that you told the police and the state's attorney that Vicious is someone you saw there that night?

A:  Saw what night? When it happened?

Q: That's the only night we are talking about, Ms. Negrete.

A: I didn't see nobody that night.

Q: My question was did you tell the police and the state's attorney that you saw Vicious out there that night?

A: Yes.

. . .

Q: What did you tell them you saw Vicious do when he was in the alley with Aggie?

A: I don't remember.

Notice that after admitting that she had told the police and the state's attorney that she'd seen Vicious killing Valencia, she testified that she didn't remember what she'd seen Vicious doing. One way to dissolve the contradiction is to interpret her testimony as a whole as an unguarded and implicit, but nevertheless credible, acknowledgment that she had indeed seen Trejo commit the murder.

There was enough evidence—if barely enough, given the well-known vagaries of eyewitness identification, see, e.g., Gary L. Wells & Elizabeth A. Olson, "Eyewitness Testimony," 54 *Ann. Rev. Psych.* 277 (2003)—to support Trejo's conviction. The denial of habeas corpus relief is therefore

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*