In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1638

BRIAN JONES,

*Petitioner-Appellant*,

*v.*

KIM BUTLER, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-C-3838 — **Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 26, 2014 — DECIDED FEBRUARY 3, 2015

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* Petitioner Brian Jones seeks post-conviction review of his convictions in Illinois state court for first-degree murder and first-degree attempted murder under 28 U.S.C. § 2254. He seeks relief on three separate grounds: that his convictions were based on insufficient evidence; that he received ineffective assistance from his trial and appellate counsel; and that his rights to due process were violated by the

denial of a post-conviction petition. We affirm the district court's denial of habeas relief.

## I. Background

In § 2254 proceedings, federal courts are foreclosed from fact-finding. We therefore defer to the findings of the Illinois trial court, which have not been challenged and are presumed to be correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Harris v. Thompson*, 698 F.3d 609, 613 (7th Cir. 2012).

Brian Jones was tried in a bench trial for the first-degree murder of Kenneth Dunne and the first-degree attempted murder of Lance Priest. *People v. Jones*, No. 1-01-947, slip. op. (Ill. App. Aug. 6, 2002). The trial focused on a shooting that took place at 91st Street and Ashland Avenue in Chicago during the early morning (1:45 a.m.) of August 17, 1998.

Priest served as the State's primary witness. He testified that Jones, whom he knew from the neighborhood as "Bird," was a member of the Blackstones gang. Priest and Dunne were standing in front of a liquor store speaking to Raleigh Pritchett, who was sitting in his car. At that moment, Jones approached from a distance of seventy-five feet, and said "what's up folks." After saying this, Jones, who was wearing jeans and a blue and white checkered shirt, reached into his waistband for a gun, whereupon Priest and Dunne immediately set off running. Jones opened fire. As he was running, Priest looked back momentarily and saw Jones shooting at them.

Dunne was fatally shot and fell to the ground. As Priest attempted to assist Dunne, he saw a red car approach, causing

him to flee several blocks away. By the time Priest returned to Dunne, police officers had arrived. Priest described the shooter to the police, including that he wore a blue and white checkered shirt. Priest identified Jones from a photograph produced by the police. While speaking with the officers, he spotted Jones driving the red car and alerted the police, who started running towards the car as it drove away. A few hours later, the officers took Priest to the apartment of Lasandra Mathies, where they had apprehended Jones.  There, Priest once again identified him as the shooter.

Chicago police officers Don Ordanas and Richard Maxwell corroborated Priest's account of the incident with the red car. The car, with its engine still warm, was found at a nearby vacant lot. Police found Jones shirtless and running down the back stairs of the building in which Lasandra Mathies's apartment was located. The officers identified Jones as the driver of the red car. They also recovered a blue and white checkered shirt from the apartment, which Sergeant Anita Medina identified as the shirt that Jones was wearing as he drove the car.

Raleigh Pritchett testified that he was sitting in his car speaking with Priest and Dunne at the time of the shooting. Pritchett stated that a man approached, said "what's up folks," and began shooting.  Altogether, the man fired nine or ten shots from a distance of fifteen to twenty feet. Despite the hour, the area was well-lighted, "like almost broad daylight." Although he was unable to see the man's face, he described the shooter as a brown-skinned black man wearing blue jeans and a blue and white checkered shirt. Pritchett did not recognize

the man and could not say from which direction the man approached.

Another witness, Sharee Jackson, testified that she saw Jones at the apartment of her cousin, Lasandra Mathies, on the night of the shooting. She described him as wearing a blue and white checkered shirt and carrying a black gun in his pants. At about 1 a.m., Jones left the apartment with Byron Manson to get cigarettes. Over the course of her testimony, Jackson offered various versions of a statement she heard Jones make when he returned home. On direct examination, she claimed that she heard Jones say "I shot a moe"—the term "moe" signifying a member of the Blackstones gang. On cross-examination, Jackson repeated this statement but acknowledged that she did not tell the police about this statement when she first spoke with them. When asked on re-direct examination what Jones's exact words were, Jackson said, "I shot a moe." On re-cross examination, Jackson denied telling police that she heard Jones say "I shot the moe."

On cross-examination, Steven Kramer, the defense counsel, elicited the following testimony from Jackson in an attempt to impeach Jackson about her statement:

Q: I want to direct your attention back to the early part of June. You remember receiving a call from someone who identified himself as Steven Kramer?

A: Yes.

Q: And do you recognize that person's voice as being my voice?

A: Yes.

Q: And you answered the phone?

A: I did.

Q: And identified you [sic]—telling you my name and who I was representing?

A: Yes.

Q: You understood I was Brian's attorney, is that correct?

A: Yes.

Q: And I asked if you would mind speaking to me about certain things that you had said to the police officers, is that correct?

A: Yes.

Q: And one of those things I asked you about was whether or not you had seen a gun on Brian's person, is that correct?

A: Yes.

Q: Do you remember what your response was?

A: I said yeah.

Q: You said you did.

A: Right.

Q: And did I ask you whether or not Brian had ever made a statement to the effect that he had shot the moe or something to that effect?

A: Yes.

Q: And what did you tell me?

A:  I said yes.

Q:  You said yes.

[Assistant State's Attorney]: I think at this point I have to interject.  Mr. Kramer's making himself a witness.  Mr. Kramer has just I think made himself a witness, thereby rendering him unable to be the lawyer.

[Mr. Kramer]: I may have at this point, Judge.

[The Court]: I would agree.  Although it's a little different than a jury.

[Mr. Kramer]: Exactly. That's what I would ask the court to consider. It is a bench trial.

[Assistant State's Attorney]: Then again we are going to have to object to discovery on behalf of defense. We had no knowledge of this alleged phone call or statement that were made to Mr. Kramer rendering him a witness. Had we had that in June when evidently this happened, perhaps something could have been done.

[Mr. Kramer]: Judge, I am taken by surprise by her response to be honest with this court.  I didn't know it would be necessary to even get into asking that question. I am surprised by what her testimony is this afternoon.

After a break, the trial judge sustained the State's objection and prevented defense counsel from perfecting his impeachment testimony.

Detective Robert Lane testified that he interviewed and took a statement from Jackson several hours after the shooting. At that time, Jackson did not state that she heard Jones say, "I

shot him, moe," or, "I shot the moe." Jackson, though, did say that Jones left the apartment two times that night, but could not recall whether he left with anyone. Jackson also stated that she saw Jones with a gun.

Lasandra Mathies provided alibi testimony for Jones, stating that he was at her apartment on the night of the shooting. Around midnight, she left with Jones to buy beer from a store and they returned immediately afterward. She testified that Jones again left the apartment at 3 a.m. with Byron Manson to purchase cigarettes. He did not have a gun on him when he left, but he did have marijuana. When Jones returned, he told her that the police chased him. Mathies admitted to lying to police when she told them that she was the last person to drive the red car earlier in the evening. On cross-examination, she stated that she also lied to the grand jury by testifying that, after purchasing beer, she dropped Jones off and returned to the apartment without him. Mathies claimed that she told the grand jury that story in response to threats from the State's prosecutor. The State's prosecutor later testified that he made no such threats.

Jones testified on his own behalf. He admitted that his nickname was "Bird," and stated that he owned and frequently wore a blue and white checkered shirt, but that it was a popular, mass-produced shirt and that others in the neighborhood wore identical shirts. He stated that he left the apartment with Mathies at approximately 1 a.m. to buy beer and returned to the apartment immediately afterwards without stopping. He admitted to driving by the scene of the shooting, but returned to Mathies's apartment because he heard one of the Gangster Disciples say: "There go Bird right there." Back at the apart-

ment, he removed his shirt because it was hot. When the police arrived, he went to the back porch to dispose of marijuana.

Robert Berk, an expert in trace evidence analysis, testified that he examined the results of the gunshot residue (GSR) test, which was performed on Jones's hands four hours after the shooting. In Berk's opinion, the results were inconclusive. Berk also testified that gunshot residue can be transferred from hands to clothing through normal activity such as changing a shirt. Berk testified that neither the government nor the defense requested that he perform a GSR test on the shirt.

The trial court found Jones guilty of first-degree murder and attempted murder and sentenced him to concurrent prison terms of 45 and 20 years, respectively. He moved for a post-verdict acquittal on multiple grounds, the most significant of which was that Priest's identification was insufficient to support a conviction and that the weight of the evidence supported a not-guilty verdict. The trial court denied Jones's motion, concluding that Priest knew Jones from the neighborhood, lacked any motive to fabricate testimony, and that his identification, although brief, took place in a well-lighted area.

Jones appealed to the Illinois Appellate Court, arguing that the evidence was insufficient to support his conviction. The court rejected his argument. *People v. Jones*, No. 1-01-947, slip. op. (Ill. App. Aug. 6, 2002).

In 2009, Jones brought an action arguing that his trial and appellate counsel were ineffective; additionally, he requested an evidentiary hearing to consider whether Priest had recanted his testimony identifying him as the shooter. Upon denial of that request, Jones argued on appeal that the failure to conduct

a hearing on this issue violated his rights to due process. The Illinois Appellate Court denied him relief. *People v. Jones*, 2012 Ill. App. 1 Div. 102516-U. The Illinois Supreme Court denied Jones's petition for leave to appeal on September 26, 2012. *People v. Jones*, 979 N.E. 2d. 883 (Ill. 2012).

On May 23, 2013, Jones brought this habeas corpus petition. He makes three claims: that there was insufficient evidence to support a conviction for first-degree murder or attempted first-degree murder; that his trial and appellate counsel rendered ineffective assistance; and, that the Illinois Appellate Court denied his right to due process by not allowing him to present evidence that Priest had recanted his identification testimony. The district court held that the evidence was sufficient to support a conviction and that the failure by the state to grant a post-conviction evidentiary hearing did not present an issue of constitutional import. Despite finding that his trial counsel had been ineffective in failing to perfect the impeachment testimony of Jackson, the court denied Jones habeas relief as such failure did not alter the outcome of his trial. Finally, because the ineffective assistance claim of appellate counsel was derivative of his claim for ineffective assistance by trial counsel, it likewise failed. *Jones v. Harrington*, No. 1:13-cv-3838, 2014 WL 859532 (N.D. Ill. March 3, 2014).

Jones appeals the district court's decision to deny his petition.

## II. Discussion

### A. Sufficiency of Evidence

Jones challenges the sufficiency of the evidence to support his conviction for first-degree murder and first-degree attempted murder. The standard of review is a rigorous one: evidence, viewed in the light most favorable to the State, is sufficient to support a conviction so long as any rational trier of fact could find the essential elements of the offense to have been proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because we consider this claim on collateral review rather than direct appeal, the Antiterrorism and Effective Death Penalty Act imposes an additional layer of defense onto this inquiry: we may grant relief on this claim only if the Illinois Appellate Court applied the *Jackson* standard unreasonably to the facts of Jones's case. § 2254(d)(1); *see, e.g.*, *Trejo v. Hulick*, 380 F.3d 1031, 1032 (7th Cir. 2004).

As the sole eyewitness identifying Jones as the shooter, Priest's testimony was the driving force behind the State's case. It also bore several hallmarks of reliability: it addressed specific facts and was corroborated by other evidence. Priest knew Jones for years from the neighborhood and recognized him immediately as the shooter. Following the shooting, he provided a detailed description of the clothing worn by the shooter and verified Jones's identification from a photograph obtained by the police after Priest named Jones. Significantly, Priest provided this description to police *before* Jones approached in a red car wearing the exact blue and white checkered shirt that Priest described the shooter as wearing. At that brief encounter, Priest identified "Bird" as the driver. Later, this same blue and white checkered shirt was found near the shirtless Jones (in Mathies's apartment) at the time of his

arrest. Finally, Priest provided an in-person identification of Jones after his arrest.

Priest's testimony was corroborated by other witnesses. Like Priest, Pritchett testified that the shooter approached the group, said "what's up folks," and opened fire as Dunne and Priest fled. Jackson testified that Jones was in possession of a gun when he left Mathies's apartment at around 1 a.m. Jones testified that he wore a blue and white checkered shirt on the night he was arrested. The only conflicting evidence at trial was the alibi testimony from Mathies and Jones. Mathies's testimony, however, loses force because of her relationship with Jones and because it contradicted her earlier testimony to the grand jury that she dropped him off on the night in question and heard gunshots when she returned from the liquor store.

The Illinois Appellate Court, reviewing the evidence in the light most favorable to the State, found sufficient evidence to support the conviction. In evaluating the reliability of Priest's identification, the court considered various factors, including: that the area was well-lighted; there was nothing obstructing Priest's view of the shooter; he saw the shooter's whole body; he recognized the shooter as "Bird" from the neighborhood; he immediately and unequivocally identified the shooter within minutes of the shooting; he provided a detailed description of Jones's clothing; identified Jones in a photograph; and, identified him once again to the police when he saw him driving the red car. Taken together, these factors led the court to "conclude that a rational trier of fact could find Priest's identification of defendant sufficiently reliable to sustain defendant's convic-

tions." *People v. Jones*, 2012 Ill. App. 1 Div. 102516-U at 10 (citing *People v. Curtis*, 262 Ill. App. 3d 876, 881–82 (1994)).

There was no legal error in this judgment. Taken as a whole, the evidence was more than sufficient to support Jones's convictions for first-degree murder and first-degree attempted murder. Even if Priest had been the sole witness to testify against Jones, his testimony alone would be legally sufficient to convict Jones. *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (stating that the "testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar."). That Priest's testimony was corroborated by other witnesses underscores its sufficiency. Accordingly, the district court properly denied Jones habeas relief based on the challenge to sufficiency of the evidence.

## B. Ineffective assistance of counsel

The Illinois Appellate Court denied Jones's claim for ineffective assistance of counsel. We assesses whether this determination involved an unreasonable application of federal law. Under *Strickland v. Washington*, 466 U.S. 668 (1984), to establish ineffective assistance of counsel, a petitioner must show two things: that his counsel's performance fell below an objective standard of reasonableness, and that he was prejudiced as a result. *Id.* at 687–88. The actions or omissions of a counsel prejudice a party where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

Before addressing the most pressing issue—whether Jones's trial counsel was ineffective for failing to perfect impeachment of Jackson—we turn briefly to the other allegations of ineffec-

tive assistance brought by Jones against his trial counsel. In short, none of them has merit, and they have been rightly dispatched by each court that has reviewed them.

*GSR Testing of Jones's shirt*: Jones's trial counsel made a tactical decision to forgo gunshot residue testing because this testing could have proven detrimental to Jones while offering little chance to improve his case. As things stood, Jones was able to argue to the jury that the absence of such residue on his hands played to his favor, and that, by neglecting to test the shirt, the government failed to establish its burden of proof. These arguments were available to Jones without testing the shirt; for this reason, the state appellate court found that Jones's trial counsel was not ineffective. In so holding, the Illinois Appellate Court reasonably applied *Strickland*.

*Failure to impeach Priest about Dunne's gang affiliation*: Priest testified that Dunne did not belong to a gang; however, on the night of the shooting, he told police that Dunne was a fellow member of the Gangster Disciples. The conclusion of the Illinois Appellate Court was a correct application of *Strickland*: Jones's counsel made a reasonable decision to forgo the point rather than impeach Priest on a relatively minor point that supported the prosecution's theory that the shooting was motivated by gang rivalry. The Illinois Appellate Court's conclusion was a reasonable application of *Strickland*.

*Failure to interview or call Manson and Lester*: Jones testified at trial that Manson and Lester were with him at Mathies's apartment on the night of the shooting and that he left with Manson at 3 a.m. to buy cigarettes. Jones's trial counsel did not interview either witness, nor did he call them at trial. The

Illinois Appellate Court recognized that an attorney's failure to
investigate to ascertain witness testimony can serve as a basis
for ineffective assistance. Here, however, both Manson and
Lester were subpoenaed by the State as prosecution witnesses
but failed to appear. In fact, the Illinois Appellate Court noted
that statements provided by the two men to police on the night
of the shooting would not have supported an alibi defense; the
shootings took place around 1:45 a.m. and the statements
suggest that Jones left the apartment at 1:30 a.m. and returned
an hour later. *People v. Jones*, Ill. App. at 14. On this account, the
court found that Lester and Manson were properly State
witnesses whose testimony would have rebutted that of Jones
and Mathies. Even if Manson or Lester offered testimony
favorable to Jones, it risked exposing them to significant
impeachment evidence on account of their prior statements
that Jones was not at the apartment or with them at the time of
the shooting. Given these factors, the Illinois Appellate Court
correctly found that the decision to forgo interviewing Manson
and Lester was within the sound discretion of the trial counsel
and was not ineffective assistance.

   *Failure to provide notice of alibi defense*: The Illinois Appellate
Court reviewed Jones's claim that counsel did not consult him
about a theory of defense and did not disclose the alibi defense
until after the trial had already begun, in violation of the
discovery rules requiring advance disclosure of this defense.
The court found that Jones had not offered any evidence to
show that he was prejudiced by this failure. This was the
correct holding; Jones does not allege that he attempted to
mount an alibi defense to rebut specific accusations but was
prevented by the trial court for failing to disclose such an alibi

earlier. Instead Jones argues that because an alibi defense was potentially available but not utilized by defense counsel, it must be ineffective assistance. Absent any facts to suggest a viable alibi defense to rebut specific facts, we cannot find ineffective assistance of counsel. The failure to call Manson and Lester was not ineffective assistance because it was unlikely that either could provide favorable testimony for Jones, still less develop an alibi defense. In like fashion, this claim fails; had there been some evidence of a viable alibi defense, Jones's argument would have merit. Without such evidence, it does not. For this reason, he satisfies neither prong of *Strickland*.

*Cumulative errors*: Jones also argues that the errors of trial counsel, considered together, were sufficiently prejudicial to warrant a new trial. The Illinois Appellate Court did not review this claim. The district court concluded that the failure to review by the Illinois Appellate Court was not error because, with the exception of the failure to impeach a witness, Jones had failed to show professionally unreasonable conduct. We agree. Jones has not established more than one error so there is no "cumulative" effect; nor can he establish that the case would have turned out differently as a result of a series of errors.

*Failure to impeach Jackson*: At trial, Jones's counsel asked Sharee Jackson questions about a telephone conversation she had with Jones's counsel prior to trial. Specifically, Jones's counsel questioned Jackson about whether she, in fact, told him that Jones never said that he "shot the moe." Jackson denied saying this to him. The prosecution objected that Jones's counsel was making himself a witness. Admittedly caught unawares by Jackson's answer, Jones's counsel acknowledged

that he "may have" made himself a witness, and abandoned the line of questioning.

The Illinois Appellate Court did not hold this to be ineffective assistance, noting that the cross-examination of Jackson was not limited to this aborted impeachment. Examining the record, the court held that "defense counsel extensively cross-examined Jackson on many issues, including her prior statements regarding defendant's statement and defendant's possession of a gun." *Jones*, 2012 Ill. App. at 10. The court noted that defense counsel called a detective to testify that Jackson did not report that Jones said: "I shot him, moe." Further, he elicited testimony that Jackson did not initially inform police that Jones had a weapon, but first reported this to police later when she was at the police station. Noting that the decision not to impeach a particular witness is normally considered a strategic choice within the discretion of counsel, the court found that Jones failed to establish the first prong of *Strickland*. It stated: "At worst, with the benefit of hindsight, we could classify counsel's decision not to perfect the impeachment regarding Jackson's statements to him as a mistake in trial strategy or an error in judgment." *Id*. at 11. Such mistake, however, did not rise to such level that it rendered the actions of defense counsel constitutionally defective.

The district court disagreed with the Illinois Appellate Court, noting that a "reasonably competent lawyer would have anticipated an objection to the lawyer's attempt to impeach a witness on a prior inconsistent statement heard only by the lawyer." *Jones*, 2014 WL 859532 at *10. The district court noted that—to avoid exactly this predicament—the normal practice is for the lawyer to conduct the conversation in the presence of

a "prover," that is, a third party who can independently testify about the contents of the conversation. *Id*. at 10–11. Jones's counsel, of course, failed to do this and found himself in a bind, having to choose between withdrawing as counsel to serve as witness or abandoning the attempt at impeachment. He chose the latter. On this account, the district court noted that the failure to interview Jackson properly constituted "a *failure* of judgment and an *absence* of strategy," rather than an exercise of discretion. In other words, the Illinois Appellate Court erred in declining to find ineffective assistance by Jones's counsel. We agree with the district court that Jones's counsel was deficient in failing to prepare for this contingency.

Finding ineffective assistance, however, is merely the first half of the *Strickland* inquiry. Despite finding that Jones failed to establish the first *Strickland* prong, the Illinois Appellate Court evaluated whether Jones was prejudiced by his counsel's failure to impeach Jackson. It concluded that Jones was not prejudiced because, notwithstanding the impeachment of Jackson, there was considerable evidence supporting a guilty verdict. Indeed, had defense counsel successfully impeached Jackson, it still would not have directly addressed the key evidence of the case: Priest's multiple identifications of Jones as the shooter wearing a blue and white checked shirt (and the discovery of this shirt by police at Mathies's apartment). In light of other evidence at trial, the Illinois Appellate Court found that Jackson's testimony on this matter was not of critical importance to the case. The district court agreed that Jones was not prejudiced by his counsel's error.

So do we. We cannot say that Jackson's testimony would have altered the outcome even if the impeachment had been perfected. At best, it would have cast doubt on Jackson's testimony about what Jones said when he returned to the apartment. The fact remains: whatever Jones may or may not have said, Priest's identification of him as the shooter remains uncontested. Therefore, we agree with the state appellate court (and district court) in concluding that Jones failed to show a reasonable probability of prejudice.

*Ineffective assistance of appellate counsel*: Jones claims that his counsel on direct appeal was ineffective for failing to raise several of the issues discussed above. Because we have found that Jones cannot satisfy both prongs of *Strickland* to establish ineffective assistance of his trial counsel, there is no basis for finding that his appellate counsel was ineffective. *Robertson v. Hanks*, 140 F.3d 707, 712 (7th Cir. 1998).

### C. Denial of Post-Conviction Petition

Along with his state post-conviction petition, Jones presented an affidavit from Priest in which he called into question aspects of his trial testimony identifying Jones as the shooter. In the affidavit, Priest stated that on the morning of the crime, the police informed him that they had caught the man who killed Dunne, led him to an area where they asked him to view a man wearing a blue and white checkered shirt, and questioned whether he was the same man who killed Dunne. Priest stated that he could not see the man's face because the lights of the police car were too bright, but he identified the man as the shooter because the police said they had other evidence

implicating the man. As a result, he was not certain whether Jones was the man who killed Dunne.

The circumstances surrounding the affidavit are murky, to say the least, as Priest had repudiated the affidavit even before the defense sought the post-conviction hearing. In its motion, the defense noted that Priest had retracted the recantation, but did so after receiving threats that his father, who was incarcerated in Illinois, would serve significant additional time if Priest did not recant. ECF 2-2 at 541.

The state trial court denied Jones's motion. He claims that this was a violation of his due process rights. The Illinois Appellate Court affirmed this denial, and the Illinois Supreme Court denied his petition seeking review of this issue. Finally, the district court denied this claim as well because, instead of a constitutional issue, it deemed the issue to be a challenge to a state court's interpretation of state law post-conviction procedures and therefore not cognizable on habeas review. *Jones*, 2014 WL 859532 at *13.

To warrant an evidentiary review on collateral review, Illinois law requires a "substantial showing" of a constitutional claim. *People v. Edwards*, 757 N.E.2d 442, 446 (Ill. 2001). "No constitutional provision or federal law entitles a defendant to any state collateral review… ." *Jackson v. Duckworth*, 112 F.3d 878, 880 (7th Cir. 1997) (citing *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)). Here, we are disinclined to substitute our judgment for that of the Illinois courts, who did not view Priest's recantation sufficiently credible to warrant a hearing. This decision was within the authority of the Illinois courts and did not implicate a constitutional claim. *See People v. Steidl*, 568

N.E.2d 837, 857-60 (Ill. 1991). Absent a constitutional claim, the district court was correct in denying habeas relief for the failure of the Illinois courts to hold an evidentiary hearing.

### III. Conclusion

For the foregoing reasons, we affirm the district court's dismissal of Jones's petition for habeas corpus.