In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3365

TODD SAXON,

*Petitioner-Appellant,*

*v.*

JACQUELINE LASHBROOK, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:15-cv-02072-CSB — **Colin S. Bruce**, *Judge.*

ARGUED SEPTEMBER 7, 2017 — DECIDED OCTOBER 18, 2017

Before WOOD, *Chief Judge,* and BAUER and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* In 2005, petitioner-appellant Todd Saxon was convicted in Illinois state court of first degree murder, arson, and concealment of homicide. The Illinois Appellate Court affirmed his conviction. After his state court appeals were exhausted, Saxon filed a petition for a writ of

habeas corpus under 28 U.S.C. § 2254, raising a number of claims, including that the evidence was insufficient to support his conviction. The district court denied the petition. We affirm.

## I. BACKGROUND

On March 30, 1995, the remains of a twelve year-old girl, O.W., were found inside a garage that had been burned in Kankakee, Illinois. Over the course of a long investigation, it was determined that O.W. had been sexually assaulted and stabbed before her remains were left inside a garage that was set on fire. A grand jury returned an indictment on April 11, 2002, charging Saxon with first degree murder, arson, and concealment of homicide. Saxon elected to proceed to trial, and a jury was empaneled on February 24, 2005.

### A. The Evidence at Trial

We need not recount the entirety of the evidence that was presented at trial. We will review the facts relevant to this appeal, and we incorporate by reference the facts set forth in the Illinois Appellate Court's opinion on Saxon's direct appeal. *See People v. Saxon*, 871 N.E.2d 244 (Ill. App. Ct. 2007).

The State presented its case over the course of three days. The State's case included testimony from fifteen witnesses, as well as numerous stipulations and exhibits.

O.W.'s mother, Regina Collins, testified that she last saw O.W. on the night of March 27, 1995. Collins had numerous other individuals living in her house at the time. The individuals who slept at Collins' house that night included: Collins' boyfriend and Saxon's uncle, Pierre Saxon; Pierre's mother, Elsi Saxon, who shared a room with O.W.; Collins' son and O.W.'s

brother, John; Collins' goddaughters Contessa Kilpatrick and Catrina Haut; Collins' brother, Webster Collins; and finally, Catrina Haut's mother, Bobbie Jackson. According to Collins, Saxon was at her house almost every day, and was there the night of March 27, 1995. Collins testified that O.W. went to bed around 9:00 p.m., and that she, Collins, went to bed shortly afterward. Collins woke up around 11:30 p.m. to an argument outside her home between Kilpatrick and Kilpatrick's boyfriend, Dwight Phagan. After telling them to keep their voices down, Collins returned upstairs to go back to bed; en route, she checked on O.W. who was still asleep. Collins told the jury that when she woke up the next morning, she instructed her son, John, to wake up O.W. since it was a school day. John could not find O.W. in her bedroom, and a search of the house made it clear that O.W. was not there. There was no sign of a break-in or forced entry.

Contessa Kilpatrick testified that she last saw O.W. after Collins told her and Phagan to stop arguing. O.W. came out of her bedroom and briefly spoke to Kilpatrick before returning to bed. She also confirmed that Saxon was in the house that night. Pierre Saxon testified that it was not unusual for his nephew to be at Collins' home because he was always welcome. Pierre testified that he, too, checked on O.W. after the argument between Kilpatrick and Phagan. O.W.'s brother, John, testified that Saxon was a part of the family, and that Saxon would stay in his room when he spent the night. John recalled occasions when Saxon and O.W. would wrestle and the two of them would be locked in a bedroom. Haut also testified about Saxon and O.W. wrestling.

Individuals from the fire department and law enforcement agencies testified about their investigation of the burned-down garage where O.W.'s body was found. Around 2:40 a.m. on March 30, 1995, members of the Kankakee Fire Department were summoned to a "fully involved," or out-of-control, fire at the garage. After the fire was extinguished, O.W.'s body was located in the smoldering garage. A dog trained to detect the presence of accelerants indicated such presence in three distinct areas. Both an arson investigator and a Kankakee Police Department officer testified that they smelled gasoline within the burned garage.

Alean Ward, Saxon's aunt, testified that she had lived at the residence with the attached garage for about two years prior to the fire, and that Saxon frequently came to her house when she lived there.

Two forensic investigators testified as to the results of O.W.'s autopsy and the DNA evidence recovered from her body. The autopsy revealed that O.W. had been stabbed in the chest twice, with one wound going directly into her heart. The autopsy further revealed that O.W. had died from the stab wounds before the fire. A rape kit was used, and swabs were gathered from O.W.'s vagina, cervix, anus, and mouth; the rectal swab recovered a sperm fraction. Numerous individuals, including Pierre Saxon and Phagan, were excluded as the sources of DNA based on blood samples from those individuals.

The State called three Kankakee Police Department detectives and officers who had interviewed Saxon over the course of the nearly seven-year investigation. First, Officer Jeffrey

Powell interviewed Saxon on April 25, 1995. Saxon told Powell that he was present in Collins' home the night of March 27, 1995, and had last seen O.W. between 8:00 p.m. and 9:00 p.m. Saxon stated that he was present for the argument between Kilpatrick and Phagan and left the house sometime between 11:40 p.m. and 12:00 a.m. to go home. The next day, Collins came to Saxon's home and told him O.W. was missing. During the interview, Officer Powell asked Saxon to give a blood sample, but Saxon declined and asked to come back the following day to provide a sample; Saxon did not show up at the Kankakee Police Department on April 26, 1995.

Detective Larry Osenga testified that he interviewed Saxon on September 1, 1995. Saxon confirmed that he was present at Collins' home the night of March 27, 1995. Osenga interviewed Saxon again the next day, and asked Saxon during that interview to provide a blood sample. Saxon declined, but arranged with Osenga to come to the police department to provide a sample on September 4, 1995. Once again, Saxon did not show up to offer a sample.

Finally, Detective Jay Etzel testified that he obtained a search warrant for a sample of Saxon's blood in February of 2000. At that time, Saxon was serving a ten-year prison sentence following a conviction for the sexual assault of his nephew. Saxon's blood sample showed that his DNA matched the DNA profile found on the sperm fraction. The investigator opined that it was less likely to obtain a DNA profile from the sperm fraction more than 72 hours after intercourse.

Etzel interviewed Saxon on February 16, 2001. Saxon told Etzel that he had told the police all he knew about O.W.'s

death back in 1995, and that he did not know who had killed O.W. Etzel read Saxon his *Miranda* rights, and Saxon signed a *Miranda*-waiver form. Etzel then confronted Saxon with the DNA evidence. Saxon contended that it could not be his DNA, and that he had never touched O.W. Saxon also initially denied being present in Collins' home on March 27, 1995, but then told Etzel that he was there for less than a minute around 10:00 p.m.

Eventually, Saxon admitted to Etzel that he had sex with O.W. in her brother's bedroom two days prior to her disappearance. Saxon said that O.W. was having sex with many other men during this time, including an individual named Marvin Landfair. Finally, Saxon stated that he knew Landfair had killed O.W. because he spotted Landfair with a bloody coat four days after O.W.'s disappearance.

After the State rested, Saxon moved for a directed verdict, which was denied. Saxon elected not to testify in his own defense, and the defense rested. After closing arguments and jury instructions on March 1, 2005, Saxon was convicted on all the charges.

### B.  Post-Conviction Procedural History

Saxon appealed his conviction on the grounds that there was insufficient evidence to sustain a finding of guilt beyond a reasonable doubt. On June 26, 2007, the Illinois Appellate Court affirmed his conviction in a 2-1 decision. *Saxon*, 871 N.E.2d at 252. The Supreme Court of Illinois denied the petition for leave to appeal on November 29, 2007.

On April 6, 2015, after exhausting his post-conviction remedies in the state court, Saxon filed a pro se petition for a

writ of habeas corpus under 28 U.S.C. § 2254, raising six claims, including that the evidence at trial was insufficient to support his conviction. The district court denied the petition on September 8, 2015. In evaluating the sufficiency of the evidence, the district court denied the claim on the merits, finding that there was sufficient evidence for a rational trier of fact to convict Saxon beyond a reasonable doubt. The district court also found that the claim was barred by 28 U.S.C. § 2254(d), since it did not involve an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

On September 1, 2016, this Court construed Saxon's notice of appeal as an application for a certificate of appealability, and granted a certificate, finding that Saxon had made a substantial showing that he was denied his rights to due process of law.

## II. DISCUSSION

### A. Timeliness of the Notice of Appeal

As an initial matter, we must decide whether we have jurisdiction over Saxon's appeal as the State contends Saxon's notice of appeal was untimely. The district court denied Saxon's habeas petition on September 8, 2015, giving him thirty days, or until October 8, 2015, to file a timely notice of appeal. *See* Fed. R. App. P. 4(a)(1)(A). On September 25, 2015, Saxon placed his notice of appeal in the prison mailing system. However, Saxon made the common mistake of addressing his notice to this Court, rather than the district court. This Court received the notice on October 13, 2015, and sent it to the district court clerk pursuant to Federal Rule of Appellate Procedure 4(d).

We find Saxon timely filed his notice of appeal. Federal Rule of Appellate Procedure 4(c)(1) applies the "mailbox rule" to incarcerated pro se petitioners for the timeliness of a notice. Accordingly, the relevant date for a prisoner's notice of appeal is the date the notice is deposited into the prisoner mail system, not when it is received by the clerk of the court. Also, Rule 4(d), the "mistaken filing rule," states: "If a notice of appeal … is mistakenly filed in the court of appeals, the clerk … must note on the notice the date when it was received and send it to the district clerk. The notice is then considered filed in the district court on the date so noted."

Nothing in either of these rules precludes a pro se prisoner from invoking both of them for the timeliness of his notice of appeal. Saxon's notice of appeal was timely because he placed it in the prison mail system on September 25, 2015, well before the thirty-day deadline. Since Saxon addressed the notice of appeal to this Court, Saxon's timely notice of appeal was forwarded to the district court clerk pursuant to Rule 4(d). Applying both Rule 4(c)(1) and Rule 4(d) together, the date of receipt of Saxon's notice of appeal in the district court was September 25, 2015, not October 13, 2015. Since the receipt date of Saxon's notice of appeal is September 25, 2015, the date Saxon placed the notice in the prison mail system, his appeal is timely and we have jurisdiction to decide his appeal.

### B. Sufficiency of the Evidence under 28 U.S.C. § 2254(d)(1)

We review a district court's denial of a habeas petition *de novo*. *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015). The Antiterrorism and Effective Death Penalty Act (AEDPA)

provides that a federal court may only grant habeas relief if the adjudication of a prisoner's claim by a state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). The standard under § 2254(d) is "difficult to meet" and "highly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations and quotation marks omitted). We apply this standard to the Illinois Appellate Court's decision on direct appeal, as that was the last state court to adjudicate Saxon's sufficiency of the evidence claim. *Makiel*, 782 F.3d at 896.

Saxon challenges the Illinois Appellate Court's sufficiency of the evidence analysis under both § 2254(d)(1) and (2). Saxon does not challenge any particular factual determination by the Illinois Appellate Court; the Illinois Appellate Court did not make any factual findings. Rather, it applied a legal standard and reached a legal conclusion in evaluating the sufficiency of the evidence. Generally, we review habeas challenges to the sufficiency of the evidence only under § 2254(d)(1). *See, e.g.*, *Jones v. Butler*, 778 F.3d 575, 581-82 (7th Cir. 2015). Thus, we will review Saxon's claim under § 2254(d)(1).

Under § 2254(d)(1), a federal court may not issue a writ because it believes the state court applied federal law incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010). Rather, the application of federal law must be "objectively unreasonable." *Id.* (citation and quotation marks omitted). "In other words, it

must be 'something like lying well outside the boundaries of permissible differences of opinion.'" *Rodriguez v. Gossett*, 842 F.3d 531, 538 (7th Cir. 2016) (quoting *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003)).

The applicable Supreme Court precedent regarding the sufficiency of the evidence is well established: "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Thus, habeas reviews of *Jackson* claims are subject to two levels of judicial deference creating a high bar: first, the state appellate court determines whether any rational trier of fact could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).

The Illinois Appellate Court identified the correct legal standard under *Jackson* for a sufficiency of the evidence challenge, and then proceeded to review the evidence in the light most favorable to the State. *Saxon*, 871 N.E. at 250–52. It concluded that a rational trier of fact could have found that Saxon had the "motive, opportunity and access" to murder O.W. and conceal her death. *Id.* at 252.

The court found that when viewed as a whole, the evidence could lead a jury to conclude that Saxon murdered O.W. in order to cover up his sexual assault of a twelve-year-old girl. *Id.* A rational trier of fact certainly could have found Saxon possessed the motive to murder O.W. in light of Saxon's

admission that he had sex with her days before her disappearance, coupled with the conclusive DNA match. The court also noted Saxon's presence on the night of her disappearance, his familiarity with O.W.'s home which showed no signs of forced entry, and his familiarity with the garage where her body was found. *Id.* A rational trier of fact could have viewed the evidence as a whole, and concluded that Saxon had the access and opportunity to murder O.W. and conceal her death. Thus, the Illinois Appellate Court's application of *Jackson* and conclusion that the evidence was sufficient to find Saxon guilty beyond a reasonable doubt of the crimes charged was not objectively unreasonable.

### III.  CONCLUSION

The Illinois Appellate Court's decision was consistent with, and did not involve an unreasonable application of the relevant Supreme Court precedent. Therefore, we AFFIRM the district court's judgment.