In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 13-3076 & 13-3777

DANIEL MAKIEL,

*Petitioner-Appellant,*

*v.*

KIM BUTLER, Warden,

*Respondent-Appellee.*

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CV 9644—**James B. Zagel**, *Judge.*

———————

ARGUED NOVEMBER 10, 2014 — DECIDED APRIL 10, 2015

———————

Before WOOD, *Chief Judge*, and ROVNER and HAMILTON,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. Petitioner Daniel Makiel was
convicted in an Illinois state court for the murder of Kathe-
rine Hoch and the armed robbery of a gas station where she
worked. He appeals from the district court's denial of his pe-
tition for a writ of habeas corpus and raises two claims on
appeal. First, he argues that his appellate counsel was consti-
tutionally ineffective under *Strickland v. Washington*, 466 U.S.
668 (1984), for failing to challenge two evidentiary rulings

during his direct appeal. Second, he contends that his constitutional right to compulsory process was violated when the trial court prevented a witness from testifying on his behalf.

We affirm. Although there were some problems in the state courts' handling of Makiel's case, he is not entitled to federal habeas corpus relief. The state courts did not apply federal law unreasonably in concluding that Makiel's counsel was not ineffective in selecting the issues to pursue on appeal. The evidence shows that his counsel selected the issues with care. One issue she raised drew a remand, and although the other two issues did not prevail, they both drew a dissenting opinion. The first issue Makiel complains she did not raise—an evidentiary ruling preventing the defense from impeaching prosecution witness Allen Martin with a pending forgery charge—was not so clearly stronger than the issues she did raise that the state courts were required to find ineffective assistance of counsel under *Strickland*. The second issue she did not raise—the trial court's exclusion of Brian Spodach's testimony about the reputations of prosecution witnesses Martin and Shane Miller—was not clearly stronger than the issues she raised.

The state court also did not act unreasonably when it found no violation of Makiel's constitutional right to compulsory process. The trial court excluded the testimony of eleven-year-old Tim Anderson, who would have blamed another young boy (not the adult Makiel) for the murder. This proffered testimony was uncorroborated at the time of trial, but its exclusion was an error. That was the basis for the state appellate court's remand in the original appeal for an evidentiary hearing. See *People v. Makiel*, 635 N.E.2d 941 (Ill. App. 1994), from which we draw most facts in this opinion.

By the time the state courts decided the constitutional issue, however, Anderson had completely disavowed his proffered trial testimony, and there was no reason to think his proffered trial testimony would have been probative or reliable. Under the circumstances, the state courts' denial of relief was not an unreasonable application of U.S. Supreme Court precedent.

I.  *Factual and Procedural History*

The complex history of this case spans more than twenty-five years. Several of our ultimate conclusions depend on evaluating the record as a whole, so we must describe in some detail each stage of Makiel's process through the state and federal courts.

A.  *The Murder of Katherine Hoch*

Katherine Hoch managed a Mobil gas station in Calumet City, Illinois. On the night of October 19, 1988, the gas station was robbed. She was taken into a back room and shot in the back of the head. The State initially charged three men with the murder and armed robbery: Samuel Ilich, Todd Hlinko, and petitioner Daniel Makiel. Ilich went to trial and was acquitted. After Ilich's acquittal, Hlinko reached a plea agreement with the State. He agreed to testify against Makiel in exchange for dropping the murder and armed robbery charges against him. Makiel was tried, convicted, and sentenced to life in prison. Makiel maintains his innocence.

B.  *Pretrial Proceedings*

On March 2, 1989, several months after the murder and robbery, police arrested Todd Hlinko on a drug offense, which also violated his probation from an earlier aggravated battery conviction. While in custody that day, Hlinko signed

a statement saying that on October 19, 1988, Makiel went in-
to the Mobil gas station alone, returned, and jumped back
into the car, and that Makiel, Hlinko, and Ilich then drove to
Makiel's house. According to the statement, Hlinko saw a
purse at Makiel's house that night before they went to sleep.

On March 16, 1989, the police arrested Hlinko again, this
time for the murder and armed robbery at the gas station.
After questioning by the police, Hlinko signed a second
statement that was inconsistent with his first statement. In
the March 16 statement, he again placed himself, Ilich, and
Makiel at the gas station, but this time he told police that he
stayed in the car while Makiel and Ilich went inside. He also
told police that after Makiel returned to the car, he saw Ma-
kiel throw something out of the window but never saw a
gun.

On April 7, 1989, Makiel was indicted for the murder and
armed robbery at the gas station. At the time, he was already
in the custody of the Indiana Department of Correction on
an attempted murder conviction. Indiana held an extradition
hearing where Makiel was represented by counsel. The ex-
tradition request was granted, and Illinois authorities trans-
ported him from Indiana to Illinois on October 20, 1989.

During the trip, an Illinois prosecutor questioned him
about the crime. Makiel answered some of the questions and
gave an arguably incriminating statement. Before trial, he
moved to suppress this statement. The state trial court de-
nied his motion.

C. *Trial*

Makiel went to trial in February 1991.[1] No physical evidence directly linked him to the crime scene. The prosecution's case rested primarily on witness testimony, especially from Hlinko, who reached a plea agreement with the State in October 1990 in exchange for testifying against Makiel.

    1. *Hlinko's Plea Agreement*

Hlinko's plea agreement in the murder case was unusually generous. Hlinko first pled guilty to the probation violation based on the sale of narcotics that led to his first arrest on March 2, 1989. Without any plea agreement on that charge, he was sentenced to five years in prison. His plea to the probation violation admitted the sale of narcotics, and he faced another possible fifteen years in prison on that charge.

When the State first approached Hlinko to offer a reduced prison sentence in exchange for testifying against Makiel, he refused. Ilich was then acquitted of the murder and armed robbery in a separate trial. After Ilich's acquittal, the State went back to Hlinko and made a much more generous offer: in exchange for his testimony against Makiel, Hlinko would receive five years in prison on the pending

---

[1] Judge Paul T. Foxgrover presided over Makiel's trial. Shortly after the trial concluded, Judge Foxgrover was convicted of stealing fines he imposed on defendants and of forgery. See *People v. Fair*, 738 N.E.2d 500, 502 (Ill. 2000); accord, Terry Wilson, *Foxgrover Sentenced to 6 Years for Theft and Forgery as Judge*, Chicago Tribune (July 15, 1992), available at http://articles.chicagotribune.com/1992-07-15/news/9203030778_1_defendants-sentenced-cook-county-circuit-judge (last visited April 9, 2015). Judge Foxgrover's crimes have not been an issue in this federal habeas corpus action.

narcotics charge, which would run concurrently with the five-year term on the probation violation, plus the State would drop the murder and armed robbery charges. In effect, he would face no additional punishment on the narcotics charge or for the murder and armed robbery. This time, Hlinko accepted the deal.

2. *Hlinko's Testimony*

At trial, Hlinko testified that on October 19, 1988, he, Makiel, and Ilich were driving a blue Oldsmobile Cutlass 442 belonging to a friend, John Miller, around Calumet City. In later testimony, John Miller said that he had loaned the car to Makiel and Hlinko and noticed from its condition the next day that it had been driven the night before.

According to Hlinko, at about 11:00 p.m. Makiel said he "would stop and get some money." They pulled up to the Mobil gas station and parked just off the road. They waited in the car for a few minutes until the two customers in the gas station had left. Then they parked the Cutlass next to a white van, which belonged to Katherine Hoch.

Hlinko testified that Makiel got out of the car, and—contrary to his earlier statements to police—that Hlinko himself followed Makiel into the gas station. As they entered, Hlinko saw Hoch walking from the counter toward a back room. Makiel told Hlinko to "watch out," pointed a gun at Hoch, grabbed her arm, and led her to the back room. As he acted as a lookout, Hlinko heard Makiel demand money from Hoch and heard noises like drawers slamming. Then he heard a single gunshot. Makiel left the back room holding the gun and a purse and went behind the counter to the cash register. Makiel picked up an envelope from the

register, took two packs of cigarettes, and handed the cigarettes to Hlinko. Hlinko did not see anyone else in the gas station at the time. He estimated that they had been inside the store for only a few minutes.

Hlinko and Makiel returned to the car, and Makiel put the purse under the driver's seat. Once inside the car, Hlinko repeatedly asked Makiel, "What the hell was going on?" Makiel told Hlinko that "something went wrong" inside the station but not to worry about it.

Hlinko testified that during the ensuing car ride, they stopped in an alley near Ilich's house. Makiel left the car with the purse and walked toward a dumpster. Hlinko did not see what Makiel did at the dumpster, but he noticed that when Makiel returned to the car, he no longer had the purse with him.

At about 11:30 p.m., the men reached the home of a friend, Shane Miller (no relation to the John Miller who owned the Cutlass). Shane Miller invited Makiel, Hlinko, and Ilich into his house, and the four of them smoked some marijuana. About five minutes after smoking, all four drove in the Cutlass to the Calumet Expressway. Makiel, who was driving, slowed the car down and took the gun from his pants as they crossed a bridge near Calumet City. He handed the gun to Hlinko and told him to get rid of it. Hlinko threw the gun out of the passenger-side window and into the Cal-Sag River. Shane Miller, sitting in the backseat, asked Hlinko what he threw out the window. Hlinko said it was a gun.

The four men then returned to the same Mobil gas station to get some gas. When they arrived, they saw police cars in the parking lot. A police officer stopped their car, told them

that something had happened, and directed them to leave. The four men then drove to Makiel's house, arriving around midnight. Hlinko and Makiel went upstairs to Makiel's bedroom, while Ilich and Shane Miller used the downstairs bathroom. During the moments before Ilich and Miller entered the bedroom, Hlinko again asked Makiel what had happened, and Makiel again told him that something had gone wrong but not to worry. After Ilich and Miller entered the room, Hlinko heard Makiel tell Miller about the shooting.

At about 1:00 a.m., John Pullybank and his girlfriend arrived at Makiel's house. No one said anything to them about the gas station incident. Pullybank and his girlfriend offered to go out and buy more alcohol. To Hlinko's surprise, Makiel contributed $20 for himself, Hlinko, and Ilich. Hlinko testified that the $20 surprised him because Makiel usually had no money on him and Hlinko had paid for everything earlier that evening. In later testimony, Pullybank said that he was friends with Hlinko, Makiel, and Ilich, but he denied seeing Shane Miller while visiting Makiel's house that night. He also did not know for certain whether he had visited Makiel's house on the night in question.

On cross-examination, defense counsel attacked Hlinko's credibility in three main ways. First, counsel confronted Hlinko with his two earlier statements to police, which were inconsistent with each other and with his testimony at trial. In fact, at several points during cross-examination, Hlinko admitted that he "lied" to police during earlier parts of their investigation. Second, counsel confronted Hlinko with a letter he sent to Makiel in April 1989 (before he agreed to testify against Makiel) apologizing for falsely implicating him in

his earlier statements to police. In that letter, Hlinko also wrote that police officers had beaten him when he initially denied knowing anything about the murder. Third, counsel walked through Hlinko's prior criminal history and the details of his generous plea agreement with the State.

### 3. *Shane Miller's Testimony*

The prosecution called Shane Miller to corroborate Hlinko's testimony. Miller testified that he was in the Cutlass with Makiel, Hlinko, and Ilich on the night of October 19 (after the murder occurred) and saw Makiel hand something to Hlinko while the men were on the Calumet Expressway. According to Miller, Makiel told Hlinko to get rid of it, and Hlinko tossed it out the window into the Cal-Sag River. Miller asked Hlinko what it was, and Hlinko told him it was a gun.

Shane Miller also testified that the four men stayed at Makiel's house that night for about twenty-five minutes. During that time, Makiel told Miller that he, Hlinko, and Ilich had gone to the Mobil gas station and that Makiel had shot the manager. Another man, Brian Spodach, later dropped by Makiel's house and gave Miller a ride to Miller's sister's house.

On cross-examination, defense counsel confronted Shane Miller with a signed statement from February 1990 saying that his earlier statements to police implicating Hlinko and Makiel in the gas station murder were untrue. He testified that the statement was written by Hlinko's mother and that he signed the statement because she begged him. Defense counsel also pointed out that Shane Miller waited approxi-

mately five months before telling the police what he knew about the crime.

### 4.  *Allen Martin's Testimony*

The prosecution also called Allen Martin to bolster Hlinko's testimony. Martin testified that at about 11:00 p.m. on October 19, 1988, he and his girlfriend stopped at the Mobil gas station to buy gas. He recognized John Miller's distinctively-painted Cutlass 442 parked along the fence on the east side of the gas station. He saw his friends—Makiel, Hlinko, and Ilich—sitting in the Cutlass. After he paid for his gas, he waved to the three men, who were still sitting in the Cutlass, got back in his car, and drove to a game room. He estimated that he was at the Mobil station for a total of three minutes and at the game room for about twenty minutes before he left to drive his girlfriend home. On the way, Martin passed the Mobil station and saw an ambulance and police cars. He read about the murder in the newspaper and later found out that his friends had been implicated in the crime. Martin testified that it took him a while to make a connection between having seen his friends at the gas station on October 19 and their possible involvement in the murder.

### 5.  *Martin's Pending Forgery Charge*

On cross-examination, Makiel's counsel attempted to impeach Martin in several ways. Counsel had Martin admit that he (1) had been drinking the night of the murder, (2) waited a long time before coming forward to the police, and (3) denied who he was when he was initially approached by a defense attorney.

Makiel's counsel also attempted to impeach Martin with a pending forgery charge. Counsel asked Martin whether he

had been charged with forgery, and Martin flatly denied it. Defense counsel then informed the court at a sidebar conference that he wanted to impeach Martin by introducing a certified copy of the pending charge. During this sidebar, the State did not contest the fact that Martin had a pending forgery charge. The trial court nevertheless barred defense counsel from introducing the charge and ordered both sides not to discuss it further in front of the jury.

6. *Prosecutor Quinn's Testimony*

Assistant State's Attorney Patrick Quinn testified that on March 21, 1989—before Makiel was indicted—he interviewed Makiel in the presence of police investigators after reading him his *Miranda* rights. Makiel denied knowing anything about the murder. Quinn informed Makiel that a witness had seen him with Hlinko and Ilich at the Mobil gas station around the time of the murder on October 19, 1988. At that point, Quinn testified, Makiel said that he remembered that he had stopped at the gas station on that night with Hlinko and Ilich to buy some cigarettes.

7. *Physical Evidence*

A Chicago sanitation employee testified that on October 24, 1988, he found a purse containing Hoch's driver's license in a trash can in an alley less than ten minutes from Ilich's home. Hoch's husband testified that the purse belonged to his wife. A forensic scientist and fingerprint expert analyzed the purse and found sixteen latent prints suitable for comparison. Eight prints belonged to Hoch, but none of the remaining eight prints matched Makiel, Hlinko, or Ilich.

The first police officer to arrive at the crime scene testified that he found a .38-caliber shell casing in the back room

of the gas station, but it yielded no suitable fingerprints. Nor could the evidence technician find any suitable prints inside or outside the gas station. Divers searched the Cal-Sag River for the murder weapon but did not find it.

8. *Makiel's Alibi Defense*

Makiel presented an alibi defense. His sister Laura Kobak testified that he was babysitting on the night of the murder. Kobak testified that Makiel agreed to babysit so that she and her boyfriend could celebrate her birthday. According to her testimony, Makiel, Hlinko, and two others—Cory and Lisa Majszak—arrived about 6:30 p.m. on October 19, 1988. When Kobak returned around midnight, Makiel and Hlinko were alone with the children. In addition, Makiel presented several witnesses who testified that they had stopped by the gas station around 11:00 p.m. on October 19 and had not seen a blue Cutlass or a white van.

Tony Rodriguez testified that he and another man visited Kobak's house sometime after 8:00 p.m. on October 19. According to Rodriguez, when he arrived, Makiel, Hlinko, and both Majszaks were babysitting Kobak's children. He also testified that he had seen John Miller's Cutlass 442 "up on jacks" in Makiel's driveway earlier that day.

To rebut Makiel's alibi defense, the prosecution called Cory and Lisa Majszak, who testified that they did not babysit with Makiel and Hlinko on the night of the murder. They testified that they babysat at Kobak's house with Makiel and Hlinko only once, sometime after October 23, 1988. They also testified that they did not see Rodriguez on the evening they babysat with Makiel and Hlinko. The State also called a police investigator who testified that when he first

spoke to Rodriguez about visiting Kobak's house in October 1988, Rodriguez did not know the exact date of the visit.

9. *Brian Spodach's Potential Testimony*

Defense counsel also called Brian Spodach. Recall that Shane Miller testified that Spodach came by Makiel's house and gave Miller a ride on the night of October 19, 1988. Spodach testified that he neither went to the house nor gave Miller a ride that night. In addition, defense counsel sought to introduce testimony from Spodach about Martin's and Shane Miller's reputations for truthfulness. The trial court excluded the evidence. According to defense counsel's proffer, Spodach would have testified that he knew their reputations based on his contacts with other people in the community and that they had reputations for being "liars."

10. *Tim Anderson's Potential Testimony*

Makiel's counsel then sought to introduce the testimony of Tim Anderson. According to counsel's proffer, Anderson would have testified that Makiel had nothing to do with the murder and armed robbery. Anderson was prepared to testify that on October 19, 1988, when he was nine years old, he snuck out of his parents' home around midnight and met up with three friends: Brandon, Brian, and Jay. Jay said "let's go get some money," and the four boys drove Brandon's car to the Mobil gas station. At the station, Jay took out an automatic handgun, cocked it, and went inside. Anderson heard a "loud shot." Jay then returned to the car and said "I did it," and the boys drove off. Later that night, Brian told Anderson that if he told anyone what had happened, Brian would shoot him.

The prosecution moved *in limine* to bar this testimony "as not being relevant, not relating to this case and being too remote and uncertain and speculative." The trial court conducted a sidebar and heard argument from both sides. The prosecutor presented a November 1990 written statement to police from Anderson that the incident occurred in August 1988, not October 1988 when Hoch was murdered. The prosecutor also questioned Anderson's competency to testify, observing that Anderson was only eleven years old at the time of trial and that he had initially disclosed the story about the gas station murder to a psychiatrist when he was hospitalized for mental health issues.

The trial court asked defense counsel whether the November 1990 written statement was the expected testimony from Anderson. Defense counsel clarified that Anderson, if permitted to testify, would say that the incident occurred in October 1988, not August 1988. Counsel acknowledged that Anderson's written statement to police said that the incident occurred in August, but he argued that the inconsistency was simply a matter for cross-examination—not a reason to bar the testimony altogether.

The trial court granted the State's motion and barred Anderson from testifying: "The Court finds, on the matter of relevancy, the testimony here would be too remote, too speculative." It also discussed Anderson's competency and the desire to avoid trying collateral issues during the trial: "The circumstances, taking into account a competency situation, both on a mental status and the age of the witness and the remoteness of the same, reference to time of the incident, such that the court would grant the State's motion to bar." Although the trial court discussed Anderson's competency

and whether it would inject collateral issues into the trial, it clarified: "The Court has not ruled on his competency."

D.  *Direct Appeal (Makiel I)*

Makiel appealed his conviction on three grounds: (1) the October 20, 1989 statement he made after his extradition hearing should have been suppressed, (2) the trial court erred in excluding Tim Anderson's testimony, and (3) the prosecution made improper remarks during closing arguments. In a split decision, the state appellate court denied relief on Makiel's claims regarding his pretrial statement and the prosecutor's closing arguments, but it unanimously held that the trial court erred in barring Anderson from testifying. *People v. Makiel*, 635 N.E.2d 941 (Ill. App. 1994) ("*Makiel I*").

The court identified two errors with the trial court's handling of Anderson's testimony. First, in determining that the testimony was "not relevant," the trial court improperly relied on the State's impeachment evidence (the November 1990 written statement to police) and confused relevance with credibility: "The circuit court, by relying on the factors it cited, essentially determined that Anderson's proffered testimony was not sufficiently credible." *Id.* at 954. Since credibility determinations go to the weight of the testimony, not its admissibility, "the circuit court may have erred by keeping relevant evidence from the jury based on the court's impression of its credibility." *Id.*

Second, although the trial court said that it did *not* determine competency, the appellate court noted that concerns about Anderson's competency might have improperly influenced the trial court's decision. The appellate court held that the trial court erred by not examining Anderson to see if he

was in fact competent to testify. *Id.* Accordingly, the appellate court remanded the case to the trial court with the following instructions:

> We find that the circuit court here erred by failing to interview Anderson as a preliminary step to determine his competence and the relevance of his testimony. We therefore remand this case for such an inquiry. If both his competency and the relevance of his testimony are established, the circuit court is to grant defendant's motion for a new trial. If for some reason Anderson is unavailable, or unwilling, to participate in the inquiry, or if the circuit court finds him incompetent or his evidence irrelevant, we retain jurisdiction in this matter.

*Id.*

Justice McCormick concurred in part and dissented in part. *Id.* at 956–61. He agreed with the majority that the case had to be remanded to determine Anderson's competency to testify, but he disagreed with the majority that the trial court needed to address the relevance of Anderson's testimony on remand. Justice McCormick believed the majority had already decided that Anderson's proffered testimony was relevant, so a remand on this issue was unnecessary. *Id.* at 958.

He also disagreed with the majority's treatment of Makiel's other two claims and would have granted a new trial. *Id.* at 956, 961. Justice McCormick analyzed the evidence against Makiel in great detail, concluding that the evidence was "far from overwhelming" and that the State's case "hinged largely on the credibility of Hlinko's testimony at trial, which was inconsistent with all of his many pretrial

statements, some of which he made under oath." *Id.* at 958. The dissent emphasized that Hlinko's plea agreement "gave him a strong reason to lie," that all of the physical evidence that allegedly corroborated Hlinko's trial testimony was found before Hlinko accepted the plea deal, and that the allegedly corroborating testimony from Shane Miller and Allen Martin contradicted Hlinko's testimony in several respects. *Id.* at 959–60. Justice McCormick concluded: "Hlinko's testimony … is sufficient to support the conviction if the jury chose to believe it, but the evidence is closely balanced." *Id.* at 961. The Supreme Court of Illinois denied leave to appeal in October 1994.

E.  *Evidentiary Hearing and Appeal After Remand (Makiel II)*

The evidentiary hearing took place in December 1996 before a different trial judge. Tim Anderson and his mother testified. The parties also entered stipulations regarding the testimony of police officers who investigated Anderson's statement at the time of his hospitalization in 1990.

Anderson recanted his earlier story implicating "Jay" in the gas station murder. He testified that in October 1988, the month the crime occurred, he was nine years old and that at the time of the murder, he did not know Jay or the other boys mentioned in his story. He did not meet them until 1990—approximately two years after Hoch was murdered. He explained that he had fabricated the entire story to retaliate against the boys for bullying him.

After the hearing, the trial court stated its findings about Anderson's competency and the relevance of his testimony. On the issue of competency, the court found that Anderson was "intellectually challenged" at the time of Makiel's trial,

but that it did not have sufficient information to determine his competency to testify at the time of trial. It did find, however, that Anderson "was competent to testify at the December 30, 1996 hearing."

On the issue of relevance, the court found that Anderson first told the story about Jay and the gas station murder to a psychiatrist or counselor in October 1990 while he was a psychiatric patient at a hospital. The court also found that Anderson told the same story to police the following month and then again to Makiel's attorney sometime before his trial in February 1991. The court found that Anderson recanted the story for the first time four years later, in February 1995. The trial court concluded:

> Further, based upon his not telling the story until two (2) years after the event, that his story is totally [uncorroborated], his propensity to lie at an early age, his motive to fabricate, the fact that no one ever believed his story and his subsequent recantation of his story of the October 19, 1988 events involving his friend, I find that his testimony would be remote and speculative and, therefore, would not be relevant.

Supp. App. 26.

Makiel appealed, arguing that the trial court erred by determining that Anderson's testimony was irrelevant, and that in any event the principles of *Chambers v. Mississippi*, 410 U.S. 284 (1973), required its admission. The state appellate court affirmed. *People v. Makiel*, No. 1-97-2140, slip op. (Ill. App. June 8, 1998) ("*Makiel II*"). Apparently focusing on the relevance of Anderson's *hearing testimony* rather than his prof-

fered testimony at Makiel's trial, the appellate court held that Anderson's "testimony" would have been irrelevant because it had been fabricated and therefore was not "material to establishing [Makiel's] guilt." Supp. App. 29.

The court then addressed the *Chambers* argument, referring to the excluded evidence as Anderson's "prior statements." The court held that these "prior statements" constituted "inadmissible hearsay" and could be excluded under *Chambers* because they lacked insufficient indicia of reliability. Supp. App. 30–31. Citing *Chambers*, the court explained that "[w]hen judging the admissibility of [Anderson's] declaration, it must be determined whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *Id.* at 31. It then concluded that Anderson's "prior statements" did not satisfy these criteria. *Id*. The Supreme Court of Illinois again denied leave to appeal in October 1998.

F.   *State Post-Conviction Proceedings (Makiel III)*

While still awaiting the evidentiary hearing on Tim Anderson's excluded testimony, Makiel filed a motion for post-conviction relief in June 1995 under 725 Ill. Comp. Stat. 5/122-1 *et seq.* Makiel argued that his appellate counsel was constitutionally ineffective because she did not argue in his direct appeal that the trial court erred by excluding (1) Allen Martin's pending forgery charge and (2) Brian Spodach's testimony about the reputations of Martin and Shane Miller. Makiel's petition was initially stayed pending completion of his direct appeal and eventually denied without an evidentiary hearing.

The state appellate court unanimously reversed, holding that Makiel had made a substantial showing of a deprivation of his Sixth Amendment right to effective assistance of counsel. *People v. Makiel*, 830 N.E.2d 731 (Ill. App. 2005) ("*Makiel III*"). On both of Makiel's claims of ineffective assistance of appellate counsel, the court ordered an evidentiary hearing because his petition raised "unanswered questions of fact as to the strategy which motivated appellate counsel" not to challenge the trial court's evidentiary rulings. *Id.* at 745, 748. The court noted, however, that it was not taking a position on whether Makiel could ultimately prove his claims. *Id.* at 749.

G. *Evidentiary Hearing and Appeal After Remand (Makiel IV)*

The evidentiary hearing was held on March 14 and April 4, 2008. Makiel presented the testimony of the assistant public defender who represented him in his original appeal. She testified that she could not explain why she did not challenge either of the trial court's evidentiary rulings. She also testified that she did not remember "specifically considering and rejecting" the two issues. The lawyer explained, however, that she reviewed the trial record and Makiel's post-trial motion, consulted with her supervisor about which issues to raise, and discussed her strategy with Makiel during the appeal. At the conclusion of the hearing, the trial court denied Makiel's petition.

Makiel appealed again, and this time the state appellate court affirmed. *People v. Makiel*, No. 1-08-0921, 2011 WL 9548460, at *1 (Ill. App. Sept. 28, 2011) ("*Makiel IV*"). The appellate court held that the trial court had erred when it barred evidence of Martin's pending forgery charge, but that

appellate counsel was not constitutionally ineffective for failing to raise the issue because she "reasonably could have determined" that such a challenge "would not have been a meritorious issue on appeal." *Id.* at *14. The court also held that Makiel had not established prejudice from appellate counsel's failure to raise the issue. *Id.*

On Makiel's claim for failure to appeal the exclusion of Spodach's testimony about reputation, the state appellate court relied on a purported state-law rule that Makiel failed to satisfy the burden of proof applicable to third-stage post-conviction proceedings because he relied exclusively on his initial proffer and failed to present additional evidence to support his claim. *Id.* (As explained below, the State concedes on appeal that state law imposed no such requirement on Makiel.) The court also concluded that Makiel had failed to establish prejudice from appellate counsel's failure to raise this issue. *Id.* at *15. Once more, the Supreme Court of Illinois denied leave to appeal in January 2012.

H. *Federal Habeas Petition*

In December 2012, Makiel filed a petition for a writ of habeas corpus in federal district court raising claims about the prosecutor's remarks during closing arguments, the trial court's exclusion of Tim Anderson's testimony, and appellate counsel's failure to challenge the trial court's evidentiary rulings on Martin's pending forgery charge and Spodach's reputation testimony. The district court denied the petition without an evidentiary hearing and granted a certificate of appealability limited to the claim about the prosecutor's remarks. *United States ex rel. Makiel v. Atchison*, No. 12 CV 9644, 2013 WL 4538583, at *19 (N.D. Ill. Aug. 27, 2013). We granted Makiel's motion to expand the certificate of appealability to

include his other claims. On appeal, Makiel has abandoned the claim about closing arguments and raises only the claims about appellate counsel's failure to challenge the evidentiary rulings and the trial court's exclusion of Anderson's testimony.

II. *Habeas Corpus Review Under 28 U.S.C. § 2254*

We have jurisdiction under 28 U.S.C. § 2253(a), and we review *de novo* the district court's denial of habeas corpus relief. E.g., *Harris v. Thompson*, 698 F.3d 609, 622 (7th Cir. 2012). Federal courts have authority to issue writs of habeas corpus for persons in state custody under § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, a federal habeas petition may be granted only if a state court's ruling on a federal constitutional question "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2).

The standard under AEDPA is "difficult to meet" and "highly deferential." *Cullen v. Pinholster*, 563 U.S. —, 131 S. Ct. 1388, 1398 (2011). Federal courts must avoid "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 567 U.S. —, 132 S. Ct. 2148, 2149 (2012) (per curiam), quoting *Renico v. Lett*, 559 U.S. 766, 779 (2010). A petitioner cannot prevail by showing simply that the state court's decision was wrong. E.g., *White v. Woodall*, 572 U.S. —, 134 S. Ct. 1697, 1702 (2014). A petitioner "must show that the state court's ruling on the claim being presented in federal court was so

lacking in justification that there was an error well under-stood and comprehended in existing law beyond any possi-bility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Our review under § 2254(d) is limited to the record that was before the state court. *Pinholster*, 131 S. Ct. at 1398.

AEDPA's deferential standard of review applies only to claims that were actually "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Where state courts did not reach a federal constitutional issue, § 2254(d) defer-ence applies "only to those issues the state court explicitly addressed." *Quintana v. Chandler*, 723 F.3d 849, 853 (7th Cir. 2013), citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The operative decision under review is that of the last state court to address a given claim on the merits. See *Greene v. Fisher*, 565 U.S. —, 132 S. Ct. 38, 45 (2011).

III. *Ineffective Assistance of Counsel*

The Sixth Amendment provides that "the accused shall enjoy the right to … have the Assistance of Counsel for his defence." To demonstrate that his right to counsel was vio-lated by ineffective assistance, Makiel must satisfy the famil-iar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, he must show that his counsel's per-formance was deficient because it "fell below an objective standard of reasonableness." *Id.* at 687–88. Second, he must show that the deficient performance prejudiced the defense, which means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceed-ing would have been different." *Id.* at 694.

A.  *Standard of Review*

Under AEDPA, "the bar for establishing that a state court's application of the *Strickland* standard was 'unreasonable' is a high one." *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable statement that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

B.  *Performance*

To establish deficient performance under *Strickland*, Makiel must identify acts or omissions by counsel that fell below an objective standard of reasonableness and could not have been the result of professional judgment. *Strickland*, 466 U.S. at 688, 690. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105, quoting *Strickland*, 466 U.S. at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. To avoid the distorting effects of hindsight, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

1.  *Ineffective Assistance of Appellate Counsel*

The general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel, *Smith v. Robbins*, 528 U.S. 259, 285 (2000), but with a special

gloss when the challenge is aimed at the selection of issues to present on appeal. Appellate counsel is not required to present every non-frivolous claim on behalf of her client. E.g., *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996). "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986), quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983). In fact, when appellate judges address professional education programs on appellate practice, they almost always stress this need for careful selection of just a few issues on appeal. "Lawyers must curtail the number of issues they present, not only because briefs are limited in length but also because the more issues a brief presents the less attention each receives, and thin presentation may submerge or forfeit a point." *Knox v. United States*, 400 F.3d 519, 521 (7th Cir. 2005).

Because appellate counsel is not required to raise every non-frivolous issue on appeal, appellate counsel's performance is deficient under *Strickland* only if she fails to argue an issue that is both "obvious" and "clearly stronger" than the issues actually raised. E.g., *Brown v. Finnan*, 598 F.3d 416, 425 (7th Cir. 2010); *Lee v. Davis*, 328 F.3d 896, 900–01 (7th Cir. 2003). Proving that an unraised claim is clearly stronger than a claim that was raised is generally difficult "because the comparative strength of two claims is usually debatable." *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013) (reversing denial of habeas relief in unusually clear case of ineffective assistance in selecting appellate issues).

2. *Appellate Counsel's Process for Selecting the Issues*

In this case, evidence shows that Makiel's appellate counsel approached the selection process diligently. At the evidentiary hearing, which occurred a full sixteen years after the direct appeal, the lawyer explained what she remembered about her process for selecting the issues. She admitted that she could not explain why she did not appeal the trial court's evidentiary rulings about Martin's pending forgery charge and Spodach's reputation testimony. She also testified that she could not remember "specifically considering and rejecting" these issues. She explained, however, that she reviewed the trial record, including the documents in the record, transcripts of the relevant proceedings, and Makiel's post-trial motion, which raised no fewer than 54 different issues. She also testified that she made notes of the issues she could possibly raise, discussed the case and the potential issues with her supervisor at the appellate defender's office, and discussed the appeal with Makiel by letter and over the phone during the appeal. She also filed a petition for leave to appeal with the Supreme Court of Illinois after losing on two of the three issues she raised.

3. *The Issues Actually Raised on Direct Appeal*

Makiel's appellate counsel chose to present three relatively strong issues on direct appeal: (1) whether the trial court erred by failing to suppress Makiel's pretrial statement, which was given after *Miranda* warnings and after he had been represented by counsel in the extradition proceeding; (2) whether the prosecutor's closing arguments were improper; and (3) whether the trial court improperly excluded

Anderson's testimony. Counsel prevailed on the issue of Anderson's testimony. On the suppression issue, the panel majority noted that no case was "directly on point" and struggled to reconcile several cases pointing in opposite directions. See *Makiel I*, 635 N.E.2d at 952. On the closing-argument issue, Makiel's counsel did not simply present a bare-bones criticism of the prosecutor's closing argument. She criticized several types of comments by the prosecutor, all of which had some force: comments about facts not in evidence, comments about defense counsel's failure to call alibi witnesses, and comments that arguably shifted the burden of proof to the defense. See *id.* at 955–56. One justice on the panel dissented on both of these issues. See *id.* at 957, 961 (McCormick, J., concurring in part and dissenting in part).

### 4. *Allen Martin's Pending Forgery Charge*

Having described counsel's process for selecting the issues to raise and the issues she actually raised, we now turn to counsel's failure to appeal the trial court's exclusion of Allen Martin's pending forgery charge. Makiel argues that this issue was obvious and clearly stronger than the suppression issue and the issue about the prosecutor's closing arguments. The pending charge was, according to Makiel, critical impeachment evidence because it would have caught Martin in a blatant lie, shown that he had an incentive to seek favor with the government, and revealed that he had been accused officially of deception.

The state court held that the trial court erred when it excluded this evidence at trial. *Makiel IV*, 2011 WL 9548460, at *13. Nevertheless, it concluded that appellate counsel was not deficient in failing to appeal this error because she "reasonably could have determined" that it "would not have

been a meritorious issue on appeal." *Id.* at *14. This was a merits adjudication, so we apply AEDPA deference and ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

The state court's decision that appellate counsel's performance was not deficient for failing to appeal the forgery issue was a reasonable application of *Strickland*. Although we agree with Makiel that this issue was an obvious issue to appeal, we disagree that it was so clearly stronger than the issues actually raised that the state court was required to find ineffective assistance of counsel under *Strickland*. On the record before the state court, it was reasonable to conclude that appellate counsel reasonably decided not to raise this issue because she predicted that the error might well be deemed harmless. Even if appellate counsel's prediction might have been incorrect (which we do not decide), there is at least a reasonable argument that counsel satisfied the deferential *Strickland* standard, which means that we may not disturb the state court conviction on this ground under AEDPA.

A split decision under the circumstances, although not dispositive, supports our conclusion that it was not unreasonable for the state court to conclude that the issue was not clearly stronger than the issues raised. This is not a case like *Shaw v. Wilson*, for example, where the single claim actually raised was so weak that pursuing it "was the equivalent of filing no brief at all." 721 F.3d 908, 915 (7th Cir. 2013). In *Shaw* appellate counsel failed to raise the promising issue that an Indiana statute, which limited the time for amending charging documents, barred the State from belatedly amending the charge from aggravated battery to murder. *Id.* at 916.

Instead, appellate counsel filed a brief challenging only the sufficiency of the evidence but inexplicably conceded on appeal that the evidence could support either conviction or acquittal. In light of that concession, we said, the only argument raised was "dead on arrival." *Id.* at 915. Here, by contrast, the three issues appellate counsel raised were much stronger. She drew a remand on one and a dissent on the other two.

No rule limited Makiel's counsel to just the three issues on appeal. We assume she could have raised the Martin forgery issue in addition to those she actually raised. Nevertheless, given the emphasis in appellate practice on not raising too many different issues and thus not diluting or burying an appellant's strongest points, we see no unreasonable application of the *Strickland* standard by the state courts. See *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000) (selection of proper issues is one of most important parts of appellate advocacy, and too many issues can distract appellate judges from stronger issues; appellate counsel who raised only one relatively weak issue was deficient but performance did not prejudice defendant). In fact, the evidence of effective assistance in the selection of issues is substantial here, particularly when we recall the results with the issues actually raised.

Makiel counters with reasons appellate counsel should have doubted the merits of two of the arguments she raised on appeal. First, he argues that because the case law was unsettled on the suppression issue, it was necessarily weaker because the trial court's error in excluding the pending forgery charge was clearly established under settled law. Second, he argues that the closing-argument issue was clearly weaker because attorneys are given wide latitude in closing

arguments and the standard of review is deferential to the
trial court. Neither point persuades us that the state court
was required to find deficient performance under *Strickland*.

Makiel's position fails to account for the possibility that
appellate counsel declined to raise the forgery issue because
she predicted that the panel would deem the error harmless.
Identifying a harmless error does not yield success on ap-
peal. Appellate counsel's ultimate goal in selecting issues is
to "maximize the likelihood of success." *Smith*, 528 U.S. at
288. Counsel must persuade the appellate court first that the
trial court erred and then that the error was harmful. Ac-
cordingly, even if there is no doubt that a trial court made an
error, appellate counsel can decline to raise an issue when
she reasonably believes the error would be deemed harm-
less. See *Howard*, 225 F.3d at 790–91 (harmless-error doctrine
and the standard of review are appropriate factors for appel-
late counsel to consider when selecting issues).

Here, applying the AEDPA standard under 28 U.S.C.
§ 2254(d)(1), it was not unreasonable for the state court to
conclude that appellate counsel could have reasonably pre-
dicted that the trial court's exclusion of the pending forgery
charge would likely be deemed harmless. Under Illinois law,
this error would have been reviewed for harmless error un-
der *Chapman v. California*, 386 U.S. 18 (1967). See *People v.
Young*, 538 N.E.2d 461, 469–70 (Ill. 1989), citing *Delaware v.
Van Arsdall*, 475 U.S. 673, 684 (1986) (improper denial of de-
fendant's opportunity to impeach a witness for bias is subject
to harmless-error analysis). The harmless-error standard
asks whether the State can "prove beyond a reasonable
doubt that the error complained of did not contribute to the
verdict." *Chapman*, 386 U.S. at 24. The excluded impeach-

ment evidence affected only Martin's credibility. The state court reasonably determined that appellate counsel reasonably could have predicted that the issue would not likely have led to reversal because the evidence did not directly undermine Hlinko's testimony. Hlinko's testimony—not Martin's—was the linchpin of the prosecution's case, and it was corroborated by other evidence at trial.[2]

To be clear, we do not doubt the impeachment value of Martin's pending forgery. Although Martin had been impeached by other means, the pending forgery charge would have caught him in a blatant lie (he had flatly denied the charge on the stand), shown that he had an incentive to seek favor with the government, and revealed that he had been accused officially of deception. As the State correctly conceded in oral argument, this excluded impeachment evidence was not cumulative because it was different in kind from the other impeachment evidence offered at trial. See *United States v. Wilson*, 481 F.3d 475, 480–81 (7th Cir. 2007) (impeachment evidence not cumulative when it represents

---

[2] Recall that Hlinko testified that he, Ilich, and Makiel were at the gas station in the distinctive blue Cutlass on the night of the murder. Makiel's pre-indictment statement to police that he was at the gas station that evening corroborated this aspect of Hlinko's testimony. John Miller testified that he had loaned the Cutlass to Makiel, and that he noticed from the condition of the car the day after the murder that it had been driven the previous night. This, too, corroborated Hlinko's testimony. Hlinko also testified that Makiel disposed of the victim's purse in an alley near Ilich's house, which was corroborated by testimony from a sanitation worker who found the purse in an alley matching Hlinko's description.

"a new and potentially powerful line of inquiry"); *Redmond v. Kingston*, 240 F.3d 590, 591–92 (7th Cir. 2001) (same).

Nevertheless, it was not unreasonable for the state court to decide that appellate counsel could have reasonably predicted that the damage it could have done to Martin's credibility would not have extended to Hlinko and that, as a result, the appellate court might well find that its exclusion would not satisfy the *Chapman* standard. Cf. *People v. Rosario*, 536 N.E.2d 756, 760 (Ill. App. 1989) ("The improper limitation of cross-examination does not warrant reversal where there is no showing of manifest prejudice to defendant, and where the prosecution's case does not stand or fall based upon the credibility of that witness."); see generally *Van Arsdall*, 475 U.S. at 684 (applying *Chapman* standard to improper limit on cross-examination of prosecution witness calls for analysis of "a host of factors"); *United States v. Petitjean*, 883 F.2d 1341, 1348 (7th Cir. 1989) (finding limit on impeachment of government witness was harmless).

Makiel disagrees, pointing out that Martin corroborated one aspect of Hlinko's testimony that no other evidence corroborated: the precise time of the murder. Consistent with the State's theory of when the murder happened, Hlinko testified that Makiel shot the victim inside the gas station at approximately 11:00 p.m. Martin testified similarly, but, according to Makiel, no other evidence corroborated that timeline.

The problem is that the specific timing of the murder was not essential to the State's case against Makiel. Suppose for the sake of argument that the jury would have discredited Martin's testimony entirely if defense counsel had been allowed to introduce the pending forgery charge. That would

not necessarily mean that the jury would have discredited Hlinko's testimony, especially in light of the other corroborating evidence. At best, Hlinko's testimony about the timing of the murder might have gone uncorroborated. But even if the jury rejected the State's theory of the specific timing of the murder, that alone would not necessarily establish reasonable doubt as to Makiel's guilt. As a result, the state court did not apply *Strickland* unreasonably in finding that appellate counsel's decision not to pursue the forgery issue did not fall outside the wide range of professionally competent assistance.

But suppose that appellate counsel miscalculated and the panel would have found the exclusion of the pending forgery charge harmful under *Chapman*. Makiel still has not shown that the state court's application of *Strickland* was unreasonable. A miscalculation constitutes deficient performance only where the miscalculation was objectively unreasonable. "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington*, 562 U.S. at 110 (citations and internal quotation marks omitted). There is "no expectation that competent counsel will be a flawless strategist or tactician," and an attorney is not incompetent simply because of a "reasonable miscalculation." *Id.* The decision whether to raise the forgery issue was a judgment call that required an assessment of a long trial record and a host of issues, several of which could have been part of a competent appeal. Under the circumstances, we cannot say that appellate counsel's selection of the issues so clearly fell outside the wide range of professionally competent assistance that the state court was required to find deficient performance.

We recognize that even "an isolated error" can support an ineffective assistance of counsel claim if it is "sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). But "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington*, 562 U.S. at 111. Here, there is strong circumstantial evidence that appellate counsel performed her job capably. She reviewed the record, consulted with her supervisor about which issues to raise, and discussed her strategy with Makiel during the appeal. True, she also testified that she did not remember considering the specific issue of the trial court's exclusion of the pending forgery charge and could not explain why she failed to raise it. That is not surprising when the evidentiary hearing took place sixteen years after the appeal, and Makiel's post-trial motion in the district court raised 54 different issues, all of which appellate counsel had to sift through and evaluate.

If there were evidence in the record indicating that counsel was neglectful or that she otherwise failed to comply with prevailing professional norms of appellate representation, our conclusion might be different. On this record, in light of appellate counsel's relative success on appeal and her hearing testimony that she prepared diligently, the state courts could reasonably conclude that Makiel had failed to rebut the *Strickland* presumption of adequate assistance. See, e.g., *Yarborough v. Gentry*, 540 U.S. 1, 8–9 (2003) (per curiam) (state court decision not unreasonable under AEDPA where counsel omitted certain issues from closing argument but petitioner failed to rebut the presumption of adequate assistance).

In sum, the state court did not unreasonably apply *Strickland* in evaluating appellate counsel's failure to appeal the exclusion of Martin's pending forgery charge. This issue, although obvious, was not so clearly stronger than the issues raised on appeal that the state court was required to find deficient performance under *Strickland*. In addition, there is strong circumstantial evidence that appellate counsel performed her job capably. Even if the state court did not reach the correct result under *Strickland*, it at least reached a reasonable one, which is sufficient under § 2254(d) to require denial of relief on this basis.

5. *Brian Spodach's Reputation Testimony*

Appellate counsel also did not raise the exclusion of Brian Spodach's testimony about the reputations of Allen Martin and Shane Miller. Before we resolve the merits, we first address a threshold issue about the standard of review for this issue. The parties dispute whether we should consider *Makiel IV* or the state trial court's decision reviewed in *Makiel IV* as the last state court decision on the merits of this claim. Makiel tells us to look at *Makiel IV*, which is the state appellate court's decision after the evidentiary hearing in which appellate counsel testified. The appellate court held that appellate counsel's failure to challenge the trial court's exclusion of Spodach's reputation testimony was not prejudicial, but it did not decide the issue of performance. The State, on the other hand, argues that we should look instead to the state trial court's decision at the evidentiary hearing. At the conclusion of the evidentiary hearing, the state trial court held that appellate counsel's failure was not deficient performance, but it did not address the issue of prejudice. The State argues that we should "look through" *Makiel IV* and

consider the state trial court's decision instead because *Makiel IV* incorrectly relied on an invalid or non-existent state procedural rule. Cf. *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991) (describing situation where federal court will "look through" unexplained decisions to consider earlier reasoned decision).[3]

Because we conclude that Makiel is not entitled to relief on his claim even if we consider *Makiel IV* the last state court decision on the merits, we do not need to resolve this question. Accordingly, we assume, without deciding, that *Makiel IV* is the relevant "adjudication on the merits" within the meaning of § 2254(d). *Makiel IV* addressed only the issue of prejudice, so we review the issue of performance *de novo*. See *Quintana v. Chandler*, 723 F.3d 849, 853 (7th Cir. 2013), citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

Now to the merits. Assuming that *de novo* review applies, we conclude that appellate counsel's failure to challenge the exclusion of Brian Spodach's reputation testimony was not deficient under *Strickland*. Our conclusion follows from the principles discussed above.

---

[3] At the hearing, the only evidence Makiel presented on his claim that appellate counsel unreasonably failed to challenge the trial court's exclusion of Brian Spodach's reputation testimony was a stipulation that Spodach would have testified at trial that Allen Martin and Shane Miller had reputations in their community for untruthfulness. In *Makiel IV*, the court held that this offer of proof was not itself "evidence," so Makiel failed to establish prejudice because he failed to present additional evidence in support of his initial proffer. *Makiel IV*, 2011 WL 9548460, at *14. The State concedes that Illinois law imposed no such requirement on Makiel.

We agree with Makiel that the trial court's exclusion of Spodach's reputation testimony was an obvious error under Illinois law. According to Makiel's proffer at trial, Spodach would have testified that Martin and Shane Miller had reputations in the community as liars. See *Makiel III*, 830 N.E.2d at 746–47 (summarizing Makiel's proffer at trial). Under Illinois law, defense counsel should have been permitted to introduce this testimony as impeachment evidence. See *id.* at 747, citing *Rosario*, 536 N.E.2d at 760 ("Any witness may be impeached by evidence showing generally a poor reputation for truth and veracity."), and *People v. Nash*, 222 N.E.2d 473, 475 (Ill. 1967) (same).

Although the trial court's error was obvious, this issue was not clearly stronger than the issues raised; indeed, it was significantly weaker than even the trial court's exclusion of Martin's pending forgery charge. Like the trial court's exclusion of Martin's pending forgery charge, the exclusion of Spodach's reputation testimony would have been reviewed for harmless error under *Chapman*. See *People v. Bascomb*, 392 N.E.2d 1130, 1133 (Ill. App. 1979) (applying *Chapman* harmless-error doctrine to exclusion of reputation evidence). Appellate counsel could have reasonably determined that the trial court's exclusion of this reputation evidence would likely be deemed harmless. Two factors would have supported this conclusion.

First, both Martin and Shane Miller were impeached by other means, making the marginal value of this additional impeachment evidence less important than it would have been otherwise. Martin had already been impeached by evidence that he had been drinking on the night of the murder and that he denied who he was when first approached by a

defense attorney. Shane Miller was impeached by other means as well. Defense counsel introduced Spodach's testimony that he had not picked Miller up from Makiel's house on the night of the murder, contrary to Miller's testimony. Defense counsel also drew attention to Miller's silence in the five months following the murder and to Miller's pretrial statement, which he signed for Hlinko's mother, indicating that his statements to police inculpating Hlinko and Makiel were untrue. Although reputation evidence from Spodach would not have been strictly cumulative, its relative importance was diminished by the fact that the jury already had reason to doubt the credibility of Martin and Shane Miller. And evidence of this sort is generally weak evidence of credibility anyway. Cf. *Michelson v. United States*, 335 U.S. 469, 480 (1948) ("Growth of urban conditions, where one may never know or hear the name of his next-door neighbor, have tended to limit the use of [this form of evidence] and to deprive [it] of weight with juries."); *United States v. Burke*, 781 F.2d 1234, 1239 (7th Cir. 1985) (noting limits of character evidence).

Second, Spodach's reputation testimony, if credited by the jury, would have tended to undermine only Martin's and Shane Miller's credibility, but it would not have directly undermined Hlinko's credibility. As explained above, the crux of the State's case was Hlinko's testimony, which was corroborated by other evidence. The jury could have completely rejected Martin's and Shane Miller's testimony but still found Makiel guilty beyond a reasonable doubt based on the other evidence presented at trial.

Under these circumstances, we find that appellate counsel could reasonably conclude there was too great a risk the

state appellate court would find the exclusion of this impeachment evidence harmless. Cf. *People v. Lavas*, 446 N.E.2d 1188, 1193 (Ill. App. 1983) (noting that testimony about a prosecution witness's "general reputation for veracity would not significantly alter the jury's impression of his testimony"). This issue was not clearly stronger than the issues raised on appeal.

Finally, as we consider this issue, we also keep in mind the evidence of counsel's process for selecting issues for the appeal, including reviewing the record, reviewing Makiel's post-trial list of 54 issues, and conferring with a supervisor and with Makiel himself. We are also conscious of the challenge of reconstructing her thought process more specifically sixteen years after the fact. Appellate counsel's performance did not fall outside the wide range of professionally competent assistance permitted by *Strickland*.

## IV. *Compulsory Process*

We turn finally to Makiel's claim that the exclusion of Tim Anderson's testimony violated his right to compulsory process under the Sixth and Fourteenth Amendments. Before resolving the merits of Makiel's claim, we address an issue about the standard of review and then examine the significance of the state court's reasoning.

### A.  *Adjudication on the Merits*

The parties agree that *Makiel II* is the last reasoned decision on this claim. They disagree, however, about whether the court should review the decision *de novo* or through AEDPA's deferential lens. Makiel argues that *de novo* review is appropriate because *Makiel II* relied primarily on state-law evidence rules regarding relevance and hearsay. According

to Makiel, the state court's failure to "consider any federal constitutional precedent" means that *Makiel II* did not adjudicate the merits of the federal claim and is therefore not owed deference under § 2254(d). We disagree.

Deference under § 2254(d) does not require the state court to have expressly considered federal law, much less to have cited Supreme Court precedent. *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). Moreover, the state court opinion shows that the court adjudicated Makiel's federal claim on the merits. The court cited *Chambers v. Mississippi*, 410 U.S. 284 (1973), and held that the exclusion of Anderson's testimony did not violate *Chambers* because the testimony was not sufficiently reliable.

This is not a case like *Harris v. Thompson*, where the state court's reasoned explanation relied exclusively on state evidence law and "did not hint at any federal (or state) constitutional ground of decision." 698 F.3d 609, 624 (7th Cir. 2012) (applying *de novo* review to petitioner's compulsory process claim). Here, the state court explicitly considered and rejected the federal claim while discussing and applying a relevant Supreme Court precedent. It did not rely exclusively on state evidence law.

B.  *The Significance of the State Court's Reasoning*

*Makiel II* decided Makiel's claim on the merits, but aspects of the state court's reasoning are troubling. In particular, the court characterized Anderson's proffered testimony as "hearsay" and concluded under *Chambers* that the exclusion of this "hearsay" was constitutionally acceptable because his "extrajudicial declaration" about the circumstances

of the murder did not bear sufficient indicia of reliability. See Supp. App. 30–31. The fundamental problem with this analysis is that the lion's share of Anderson's proffered trial testimony would not have been hearsay.

Anderson was available at trial and prepared to testify that on the night of the murder, he drove to the gas station with his friends Jay, Brandon, and Brian; saw Jay go inside the gas station with a gun; heard a loud shot; observed Jay return to the car; and then heard Jay confess to shooting someone. The only aspect of this proffered testimony that was actually hearsay was Jay's supposed statement that he "did it." That confession, made by a third-party declarant, was an out-of-court statement that would have been offered to prove the truth of the matter asserted. Had the trial court excluded only that aspect of Anderson's testimony, *Chambers* would have fit as the appropriate framework for deciding whether Makiel's compulsory process right was violated. See *Chambers*, 410 U.S. at 300–01 (addressing third-party hearsay confessions).[4]

---

[4] We doubt that Anderson's testimony that Jay said he "did it" could qualify for admission under *Chambers* or the Illinois hearsay exception for statements against penal interest. See *People v. Bowel*, 488 N.E.2d 995, 999 (Ill. 1986) ("Generally an extrajudicial declaration not under oath, by the declarant, that he, and not the defendant on trial, committed the crime is inadmissible as hearsay though the declaration is against the declarant's penal interest."). A statement of this sort satisfies the exception only when "the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *Id.* at 1000, citing *Chambers*, 410 U.S. at 300–01, and *People v. Tate*, 429 N.E.2d 470 (Ill. 1981); see also Fed. R. Evid. 804(b)(3)(B) (hearsay exception for statement against interest in a criminal case where

But the remainder of Anderson's proffered testimony was first-hand recollection of events he claimed he had personally observed, none of which involved an out-of-court statement. Mischaracterizing the entirety of Anderson's testimony as "inadmissible hearsay" does not justify the conclusion that Makiel's right to compulsory process was not violated. See *Washington v. Texas*, 388 U.S. 14, 23 (1967) (petitioner denied compulsory process where "the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed").[5]

One aspect of the state court's reasoning, however, is not subject to this criticism. Independent of the court's conclusion that Anderson's "prior statements" were "inadmissible hearsay," the court also concluded that there was no error because "there is no indication Anderson's testimony would affect any fact which was material to establishing defendant's guilt." Supp. App. 29. The court based this conclusion on its review of the entire record, including the 1996 hearing

---

the statement is "supported by corroborating circumstances that clearly indicate its trustworthiness").

[5] The cases cited by the State are distinguishable on precisely this basis. See *Ruhl v. Hardy*, 743 F.3d 1083, 1099–1100 (7th Cir. 2014) (no constitutional error where defendant was denied opportunity to present testimony from witness that unavailable third-party declarant had confessed to crime); *Cunningham v. Peters*, 941 F.2d 535, 538–41 (7th Cir. 1991) (no constitutional error where defendant was denied opportunity to present testimony from defense investigator that unavailable third-party declarant had confessed to crime).

where Anderson methodically and completely recanted his proffered trial testimony.

Ultimately, then, the state court's flawed reasoning on hearsay does not matter for our review under § 2254(d). The court's materiality determination did not rely on the court's mischaracterization of the testimony as hearsay. And, even if it did, "a bad reason does not necessarily mean that the ultimate result was an unreasonable application of established doctrine." *Brady v. Pfister*, 711 F.3d 818, 827 (7th Cir. 2013); see also *Lopez v. Thurmer*, 573 F.3d 484, 493 (7th Cir. 2009) (noting that although the state court "applied the wrong methodology in deciding the federal due process issue before it, it is not the court's methodology but its result that we review").[6] We therefore apply AEDPA deference to the state court's decision and ask whether the state court committed an error "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

C. *Constitutional Standard*

The Sixth Amendment guarantees the accused the right "to have compulsory process for obtaining witnesses in his favor." This clause, together with the Due Process Clause of the Fourteenth Amendment, "embodies a substantive right to present a meaningful and complete criminal defense."

---

[6] See also *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (proper inquiry under § 2254(d) is to examine "the ultimate legal conclusion reached by the court," not "merely the statement of reasons explaining the state court's decision"); *Gill v. Mecusker*, 633 F.3d 1272, 1291 (11th Cir. 2011) (same); *Clements v. Clarke*, 592 F.3d 45, 55–56 (1st Cir. 2010) ("It is the result to which we owe deference, not the opinion expounding it.").

*Harris v. Thompson*, 698 F.3d 609, 626 (7th Cir. 2012). "The right to offer the testimony of witnesses, and to compel their attendance, … is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967). This right is an "essential attribute of the adversary system itself," *Taylor v. Illinois*, 484 U.S. 400, 408 (1988), and "imperative to the function of courts," which "depend on full disclosure of all the facts, within the framework of the rules of evidence." *United States v. Nixon*, 418 U.S. 683, 709 (1974).

In spite of its importance, this right is not unlimited. As a general rule, the defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Although the defendant's interest in presenting testimony of witnesses in his favor is fundamental, it must "bow to accommodate other legitimate interests in the criminal trial process," *Rock v. Arkansas*, 483 U.S. 44, 55 (1987), such as the "integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process," *Taylor*, 484 U.S. at 414–15. The Compulsory Process Clause thus does not require criminal courts to admit evidence that is irrelevant, *Crane v. Kentucky*, 476 U.S. 683, 689–90 (1986), testimony by persons who are mentally infirm, see *Washington*, 388 U.S. at 23 n.21, or evidence that represents a half-truth, see *United States v. Nobles*, 422 U.S. 225, 241 (1975).

To establish that his right to compulsory process was violated by the exclusion of Anderson's testimony, Makiel must show that (1) the testimony would have been "both material and favorable" to his defense, *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982), and (2) the exclusion was "arbitrary" or "disproportionate" to the evidentiary purposes advanced by the exclusion, *United States v. Scheffer*, 523 U.S. 303, 308 (1998), quoting *Rock*, 483 U.S. at 56; see *Harris*, 698 F.3d at 627. To win federal habeas relief, he must show that the state court's decision was not merely wrong but unreasonably so, beyond the scope of reasonable disagreement among fair-minded judges.

D. *Application*

The state court's decision that Makiel was not denied his right to compulsory process was not an unreasonable application of clearly established federal law. On the record before the state court, which included Anderson's 1996 hearing testimony as well as the state trial court's factual findings from that hearing, it was not unreasonable for the state court to conclude that Anderson's testimony was not material.

The materiality standard of the Compulsory Process Clause analysis is identical to the materiality requirement of *Brady v. Maryland*, 373 U.S. 83 (1963). *Harris v. Thompson*, 698 F.3d 609, 627 (7th Cir. 2012), discussing *Valenzuela-Bernal*, 458 U.S. 858. "Under this standard, the exclusion of a witness is material 'only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact.'" *Id.*, quoting *Valenzuela-Bernal*, 458 U.S. at 874.

Anderson's proffered testimony would have satisfied this materiality standard at the time of the trial. That is why Ma-

kiel's original appeal resulted in a remand for an evidentiary hearing. Anderson was prepared to testify that on the night of the murder he drove to the gas station with three young friends, saw Jay leave the car and walk into the gas station with a gun, heard a loud noise, and saw Jay return to the car. Although the evidence against Makiel was sufficient to sustain the conviction, we cannot say based on our review of the trial record that the evidence was overwhelming. Cf. *Makiel I*, 635 N.E.2d at 958, 961 (McCormick, J., concurring in part and dissenting in part) (analyzing trial record in great detail and concluding that evidence was "far from overwhelming" and "closely balanced"). Because the evidence of guilt was not overwhelming and Anderson was prepared to testify that another person committed the murder, there is a reasonable likelihood that the exclusion of Anderson's proffered testimony affected the outcome.

But Makiel's claim presents an unusual situation. Anderson recanted this proffer under oath at the 1996 hearing. He testified at the hearing that he fabricated the story to retaliate against three boys who had been bullying him. He explained that he first told this story to a counselor or psychiatrist while he was a psychiatric patient at a hospital, sometime in October 1990—two years after the murder. He also explained that he did not even know Jay at the time of the murder in 1988. At the conclusion of the evidentiary hearing, the state court found as a matter of fact that police had investigated his story in 1990 and could not corroborate it. On appeal from the trial court's decision at the evidentiary hearing, the state appellate court held that in light of Anderson's recantation and the lack of corroboration for the original proffered trial testimony, Makiel had failed to demonstrate that the evidence was material to the verdict.

Makiel argues that the state court unreasonably applied clearly established federal law when it rejected his compulsory process claim on the basis of the 1996 hearing. He contends that the state court should have ignored Anderson's recantation and instead focused exclusively on the materiality of the initial proffer. If Anderson had been permitted to testify at trial, Makiel maintains, he would have stuck to his original story and a reasonable jury could have credited his account and found reasonable doubt. According to Makiel, Anderson's recantation merely presents a disputed question of fact that a jury must decide at a new trial. We disagree.

The question presented by these unusual facts is whether the state court unreasonably applied clearly established federal law when it measured materiality in light of the entire record rather than looking only at the trial record. In other words, when a court determines whether the excluded testimony is material, is it free to consider post-trial developments that bear directly on the reliability of the testimony, or must it confine its review to the record at the time the trial court excluded the evidence?

We think the weight of Supreme Court authority points in the direction that a court is permitted to review the entire record—not just the record at trial—when measuring materiality in the context of a compulsory process claim. But because our review under § 2254(d) is deferential and asks only whether the state court unreasonably applied clearly established federal law, we do not ultimately decide that question. Instead, we hold only that because no Supreme Court decisions clearly establish that a court considering materiality is barred from considering post-trial developments that bear directly on the reliability of the excluded testimony,

Makiel has failed to satisfy § 2254(d). See *White v. Woodall*, 572 U.S. —, 134 S. Ct. 1697, 1706 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court un-reasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.").

Our conclusion is based on the nature of the constitutional right at issue. In *United States v. Agurs*, 427 U.S. 97 (1976), the Supreme Court elaborated on the meaning of materiality. The Court explained that the "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.* at 109–10. Instead, materiality in the constitutional sense is tied to the "overriding concern with the justice of the finding of guilt." *Id.* at 112. Accordingly, evidence is material only if the evidence "creates a reasonable doubt that did not otherwise exist." *Id.*

To this end, *Agurs* instructed courts to evaluate the omission of the evidence "in the context of the entire record." *Id. Agurs* said this in a case where there had been no significant post-trial developments bearing on the reliability of the omitted evidence. It is possible, then, that the Court meant "the entire *trial record* but nothing beyond that" when it said "entire record." But this possibility does not clearly establish that a court should never consider post-trial developments that bear directly on the reliability of the excluded evidence in measuring materiality.

To the contrary, the purpose of the Compulsory Process Clause supports the idea that a court can, at least under some circumstances, consider the entire record when evalu-

ating materiality. A defendant's right to present witnesses in his favor is not absolute. Courts must balance the defendant's interest in presenting evidence against "countervailing public interests," including the integrity of the adversary process, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process. *Taylor*, 484 U.S. at 414–15; see also *Nobles*, 422 U.S. at 241 ("The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth.").

Consider for a moment the extraordinary scenario that Makiel contends would be mandated by the federal Constitution. He says the state or federal courts should have vacated his conviction and ordered a new trial so that he could call Anderson to testify about the story he told back in 1990, which is (1) uncorroborated by any other evidence, (2) disavowed by Anderson himself as a troubled boy's misguided effort to get back at other boys who had bullied him, and (3) implausible on its face. Even if Anderson's original statements might somehow have been squeezed into evidence after the recantation, a new trial for that purpose would have been a strange farce, at least if the truth is supposed to remain important in a criminal trial. See *Nix v. Whiteside*, 475 U.S. 157, 175–76 (1986) (no prejudice under *Strickland* where counsel refused to present perjured testimony, even though jury might have believed the perjury and acquitted); see also *Lockhart v. Fretwell*, 506 U.S. 364, 371–72 (1993) (rejecting petitioner's argument that prejudice under *Strickland* should be evaluated under the laws existing at the time of trial and concluding that prejudice "focuses on the question whether

counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair").[7]

All three "countervailing public interests" identified by the Court in *Taylor* tend to support the state court's decision to consider the entire record in this case. The state court quite reasonably found Anderson's recantation credible and his initial proffered trial testimony not credible. The first time he told the story implicating Jay, it was two years after the crime and he was an eleven-year-old psychiatric patient. Police investigated the story before Makiel's trial and found no corroborating evidence. At the hearing, Anderson explained that he did not even know Jay at the time of the murder and that he made the story up to retaliate against the three boys for bullying him. Under the circumstances, the state court could have reasonably determined that (1) Anderson's omitted testimony was unreliable, (2) a new trial would be pointless because no rational jury would find reasonable doubt based on Anderson's improbable and now-recanted story, and (3) admitting this evidence at a new trial would prejudice the truth-determining function of the trial process. See *Taylor*, 484 U.S. at 414–15.

At bottom, the constitutional right Makiel invokes is "designed to vindicate the principle that the 'ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts.'" *Id.* at

---

[7] These two cases involved *Strickland* claims, not compulsory process claims. But the prejudice component of a *Strickland* claim is identical to the materiality requirement of the Compulsory Process Clause analysis. *Harris v. Thompson*, 698 F.3d 609, 627–28 (7th Cir. 2012).

411, quoting *United States v. Nixon*, 418 U.S. 683, 709 (1974). That principle applies here, where Makiel asks us to overturn a state court conviction based on a partial presentation of the facts. Given the unusual circumstances of this case and the absence of controlling Supreme Court precedent, we cannot say the state court's decision on Tim Anderson's proffered testimony was an unreasonable application of clearly established law.

We AFFIRM the district court's denial of Makiel's petition for a writ of habeas corpus.